**Barbara CHARLES and Jeffrey H. Newman, Plaintiffs,**

v.

**"John" ODUM, "John" Scott, "John" Edmunds, "John" Itzkowitz, The City of New York, Kenneth Schaeffer, and Edward C. Sullivan, Defendants.**

No. 84 Civ. 4817 (PKL).

United States District Court, S.D. New York.

June 15, 1987.

748

Roberts & Roberts, New York City, for plaintiffs; Michael J. Roberts, of counsel.

Peter L. Zimroth, Corp. Counsel of the City of N.Y., New York City, for city defendants; Margaret M. Lyons, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for state defendants; Nancy M. Lerner, of counsel.

LEISURE, District Judge:

Defendants in this civil rights action pursuant to 42 U.S.C. § 1983 have moved for summary judgment under Fed.R.Civ.P. 56.

*Factual Background*

This case grows out of a quarrel between two women sharing an apartment. The following narrative has been drawn from the parties' statements pursuant to Civil Rule 3(g) of the Southern District, depositions of the plaintiffs, and other exhibits to the parties' motion papers. The Court finds that there is no genuine issue as to any material fact. *See* Fed.R.Civ.P. 56(c).

At some point in the fall of 1981, Barbara Charles, a plaintiff herein, met Janet Sturman and made arrangements to share Charles' two-bedroom apartment. The apartment was located at 160 Claremont Avenue, # 4D, New York City. Charles and Sturman agreed that Sturman would

live in one bedroom and have the use of common areas, including the kitchen, bathroom, front room and hallway. Sturman would also be allowed use of the furnishings in the apartment.

Every month while she lived in the apartment, up to and including May 1984, Sturman paid Charles an amount fully covering the rent that Charles was being charged by her landlord, plus an additional $100. Sturman and Charles also agreed to divide the utilities expenses, with Sturman paying about two-thirds of the total. Jeffrey Newman, Charles' fiancé and a plaintiff herein, never entered any agreement with regard to the apartment and never used it as his residence.

From the fall of 1981 through the spring of 1984, Sturman lived in the apartment. Charles rarely stayed there overnight, but used it during the day for studying and other purposes about two or three times a week at most. *See* Transcript of Deposition of Barbara Charles, held on November 19, 1985 (the "Charles Deposition"), at 17–18, 72, 77–78, 128.

In May 1984, Sturman and Charles had a disagreement concerning the use of the apartment. On May 22, 1984, as a result of this disagreement, Charles hired a locksmith to change the locks on the apartment. Charles took this action after discovering that the locks had already been changed to prevent her entry. Sturman was not at the apartment when Charles had the locks changed and Sturman was not given keys to the new locks at that time.

During the evening of May 22, 1984, Sturman found that the locks had been changed and that she could not get into the apartment. Her belongings were still inside. Seeking assistance, Sturman telephoned the community office of Edward C. Sullivan, a New York State Assemblyman and a defendant herein. She spoke with Kenneth D. Schaeffer, a full-time member of Assemblyman Sullivan's staff and a defendant herein.

Sturman told Schaeffer that she had been subletting the apartment for several years, that she had paid rent through the end of May 1984, and that she had been locked out. Schaeffer suggested that Sturman contact the police. Sturman had difficulty securing assistance from the police.

At about 10:00 p.m., Sturman returned to the apartment and again attempted to gain entry. By that time, Charles and Newman were inside the apartment. Charles refused to allow Sturman inside, did not give Sturman a key, and did not indicate when she would allow Sturman to retrieve her belongings.

Sturman again contacted Schaeffer by telephone, and he agreed to come to the building to provide assistance. When Schaeffer arrived, Sturman produced her rent receipts for the apartment up to and including May 1984. During the next few hours, Schaeffer made several telephone calls on Sturman's behalf. At about 1:00 a.m., Sturman and Schaeffer went to the 26th Precinct stationhouse ("the stationhouse") at 520 West 126th Street.

Sturman spoke with various police officers at the stationhouse, including Michael Odom and Leo Itzkowitz, also named as defendants herein. Sturman stated that she lived in the apartment, that she had returned there and found that the locks had been changed, and that her landlord was occupying the apartment and refusing to let her inside. Sturman produced the rent receipts for inspection by the police officers.

The police officers consulted Interim Order No. 41 of the New York City Police Department. That guideline discusses actions to be taken pursuant to provisions of the Administrative Code of the City of New York prohibiting the eviction, by means other than a court order, of any occupant of a dwelling unit who has lawfully occupied the unit for thirty consecutive days. Violation of such provisions (the "anti-eviction code") is a Class A misdemeanor.

Itzkowitz and Odom accompanied Sturman and Schaeffer back to the apartment sometime between 1:00 a.m. and 2:00 a.m. The police officers approached the apartment and knocked loudly on the door. The knocking aroused Charles and Newman,

who had been asleep inside. Newman was staying in the apartment at Charles' invitation.

Charles went to the door and asked who was there. The police officers identified themselves and asked her to open the door. Charles could see through the peephole that Itzkowitz and Odom were wearing police uniforms.

During the next approximately forty-five minutes, Charles and the officers had several short conversations. The officers wanted Charles to let Sturman into the apartment, but Charles refused to open the door. At some point during this period, Charles telephoned a lieutenant at the stationhouse in order to verify that the men outside her door were in fact police officers. Also during this time, the police officers were rapping on the door and shouting, "You're under arrest." Charles Deposition at 52, 134. Charles continued to refuse to open the door.

At about 2:45 a.m., Sergeant James Edmonds and Officer Charles Scott, also named as defendants herein, arrived at the apartment. Edmonds spoke with Sturman in the hallway. Sturman stated that she had lived in the apartment for about three years, that Charles had changed the locks, and that Charles was refusing to allow her inside. She again produced her rent receipts.

Edmonds joined the other officers in attempting to speak with Charles and to gain entry to the apartment. At some point, Newman undid the lock but left a safety chain in place on the door. Itzkowitz and Odom then broke the chain. Odom and Itzkowitz, followed by Scott and Edmonds, entered the apartment and told Charles that she was under arrest.

Charles walked into the bathroom, and two of the officers followed her. One of the officers displayed handcuffs and both of them stated that Charles was under arrest. Charles Deposition at 56–57, 67. They also threatened to arrest Newman. *Id.* at 57.

After a short time, Sturman and Schaeffer also entered the apartment. At various points, the defendants were in the hallway, bathroom, front room, and kitchen, which were common areas in the apartment. *Id.* at 57–60, 131–32; Transcript of Deposition of Jeffrey Newman, held on November 25, 1985 (the "Newman Deposition"), at 60. Also, they possibly may have entered Sturman's bedroom, but not Charles'. Charles Deposition at 131–32.

At some point after the police entered the apartment, Charles or Newman telephoned John Lipsett, Esq., an attorney with whom Charles had previously consulted on May 22. Schaeffer spoke to Lipsett on the telephone, and the two reached an understanding that if Charles and Newman would leave the apartment that evening, then Sturman would not press charges. Following this conversation, one of the police officers gave Charles a summons charging her with a violation of the anti-eviction code. Shortly thereafter, Charles and Newman left the apartment.

It is undisputed that during the foregoing incident, none of the defendants touched Charles or Newman in any manner. It is also undisputed that Assemblyman Sullivan was not present at the apartment at any relevant time.

### Discussion

■ Section 1983 "is not itself a source of substantive rights...." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2694 n. 3, 61 L.Ed.2d 433 (1979). Rather, recovery under § 1983 "is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or federal statutory right...." *Patterson v. Coughlin*, 761 F.2d 886, 890 (2d Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). As defendants have noted, plaintiff's complaint fails to specify the constitutional or statutory rights which are alleged to have been denied in this case. *See* Supplemental and Amended Complaint at ¶¶ 28, 31, 34, 36, 39, 42 (alleging merely that plaintiffs were "deprived of [their] Constitutionally protected rights"). In opposing defendants'

motion,[1] however, plaintiffs stated that they were relying on an alleged denial of their fourth amendment rights.[2] Defendants have responded that there was no search and no arrest within the meaning of the fourth amendment. *See* Memorandum of Law of City Defendants at 11. The Court has assumed, for the purposes of the following discussion, that the apartment was searched and that the plaintiffs were arrested.[3]

▮ It is well-settled that a search conducted pursuant to a voluntarily obtained consent comes within an exception to the general warrant requirement of the fourth amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Such consent may be obtained not only from a criminal defendant, but also "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7. *See, e.g., J.L. Foti Construction Co. v. Donovan*, 786 F.2d 714, 717 (6th Cir.1986) ("[V]alid third-party consent requires only that the third party have 'common authority' over the premises searched and that his consent be voluntary."); *United States v. Ocampo*, 492 F.Supp. 1211, 1237 n. 17 (E.D. N.Y.1980) ("[R]elationship to and common authority over the premises searched gave [wife] sufficient authority to consent to the search."), *aff'd in relevant part*, 650 F.2d 421, 428–29 (2d Cir.1981). Whatever the precise nature of the proprietary relationship between Charles and Sturman, it is clear that Sturman qualified as one with authority to consent to a search of the apartment. Sturman was the primary user of the apartment over a period of nearly three years, had paid rent to continue living there at least through May 1984, and enjoyed unrestricted access until Charles installed new locks on May 22, 1984, thereby triggering the series of events leading to this lawsuit.[4]

▮ Plaintiffs have sought to distinguish *Matlock* on two grounds: first, that Charles was present in the apartment at the time of any search and, second, that she explicitly refused to consent to any search. Both of these circumstances, however, have been held constitutionally insig-

---

1. Plaintiffs submitted no memorandum of law addressed to the instant motion. Plaintiffs' submitted an affidavit of their counsel, Michael J. Roberts, Esq., sworn to on April 29, 1986 (the "Roberts Affidavit"), and various exhibits annexed thereto, including a memorandum of law previously filed in connection with a prior motion by defendants.

2. *See* Roberts Affidavit at 11. Accordingly, the Court finds it unnecessary to address defendants' arguments concerning possible claims of denial of procedural and substantive due process rights.

3. *See Reed v. Schneider*, 612 F.Supp. 216, 220–221 (E.D.N.Y.1985) (whether mere entry into home without consent constitutes unreasonable search under fourth amendment); *United States v. Ceballos*, 812 F.2d 42, 46, 49 (2d Cir.1987) (Seizure under fourth amendment occurs where reasonable person would believe, in view of all of the circumstances, "'that he was not free to leave.'") (citation omitted).

4. The fact that the locks were changed while Sturman was away from her apartment did not affect her authority to consent to the entry by police. *See United States v. Long*, 524 F.2d 660, 661 (9th Cir.1975). Moreover, Sturman's authority was not lessened because her interests were opposed to that of plaintiffs. *See, e.g., J.L. Foti Construction Co.*, 786 F.2d at 716–17 (where "interested party" had denied consent); *United States v. Crouthers*, 669 F.2d 635, 642–43 (10th Cir.1982) (where consenting spouse had been living away from husband prior to search); *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir.1974) (where people who consented had wanted "to be rid of any connection with" defendant).

nificant. *See United States v. Hendrix,* 595 F.2d 883, 885 (D.C.Cir.1979); *United States v. Bethea* 598 F.2d 331, 335 (4th Cir.), *cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *United States v. Baldwin,* 644 F.2d 381, 383 (5th Cir.1981); *United States v. Sumlin,* 567 F.2d 684, 687–88 (6th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978); *United States v. Canada,* 527 F.2d 1374, 1379 (9th Cir.1975), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976). *Accord People v. Cosme,* 48 N.Y.2d 286, 292–93, 422 N.Y.S.2d 652, 655–56, 397 N.E.2d 1319, 1322–23 (1979) (Defendant "has no right to prevent a search in the face of the knowing and voluntary consent of a co-occupant with equal authority."); *United States v. Serna,* 625 F.Supp. 548, 551, 557 (S.D.N.Y.1985) (Consent obtained from two co-occupants was valid against another who had been held in custody nearby.); *United States v. Alonzo,* 542 F.Supp. 1312, 1317 (S.D.N.Y.1982) (Co-occupant's consent "provided a valid and independent basis for the search....").[5]

In *Matlock* itself, the defendant had just been arrested and was in the front yard of the residence when the third person's consent to search was obtained. *Canada,* 527 F.2d at 1379; *Sumlin,* 567 F.2d at 687. It has been held, therefore, that by sharing an apartment with his sister, a defendant assumed the risk that she "might consent to a search of the bedroom at any time, even when he, himself, was present." *Bethea* 598 F.2d at 335. Moreover, no fourth amendment violation has been found even where a present party explicitly refuses to authorize a search that his co-inhabitant is willing to permit. *See, e.g., Sumlin,* 567 F.2d at 687–88. In sum, *Matlock's* third party consent analysis looks not to the presence or absence of a party but to whether the party assumed the risk that another might consent to the search. *Donovan v. A.A. Beiro Construction Co.,* 746 F.2d 894, 899 & n. 4 (D.C.Cir.1984). *See also United States v. Block,* 590 F.2d 535, 539–40 & n. 5 (4th Cir.1978).

■ On the facts of this case, the Court concludes that plaintiffs assumed the risk that Sturman might consent to a search of the apartment. This conclusion is clear, particularly in view of the fact that Charles used the apartment only infrequently, stopping there occasionally during the day and rarely sleeping there during the nearly three years of Sturman's occupancy. *See* Charles Deposition at 17–18, 72, 77–78, 128.[6] Accordingly, the Court holds that any search of the apartment was conducted pursuant to valid consent of Sturman.[7] *See Buettner-Janusch,* 646

---

**5.** While the Court of Appeals for the Second Circuit has not addressed these precise issues, it has interpreted *Matlock* broadly. "The well established rule in this Circuit is that '[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search.'" *United States v. Buettner-Janusch,* 646 F.2d 759, 765 (2d Cir.) (citations omitted), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981). In *United States v. Isom,* 588 F.2d 858 (2d Cir.1978), a "guest" who had been permitted to stay in an apartment from time to time asserted a violation of his fourth amendment rights. 588 F.2d at 860. The Court held that the "lawful tenant ... clearly had authority to consent to a search of her premises, even though a 'guest' was also present." *Id.*

**6.** Newman never lived in the apartment and visited there even less frequently than did Charles. *See* Newman Deposition at 17, 19, 21; Charles Deposition at 21–22.

**7.** It appears that any search conducted in this case was limited to the common areas of the apartment and Sturman's bedroom. *See* Charles Deposition at 57–60, 131–32. Even if the defendants also entered Charles' bedroom, however, no fourth amendment violation occurred. Where a joint tenant exercises complete access to an apartment, other occupants assume the risk that he may permit police officers to enter any part of it. *United States v. Jenkins,* 496 F.2d 57, 72 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). *See also United States v. Cataldo,* 433 F.2d 38, 40 (2d Cir.1970) (Where tenants exercise joint control over entire apartment, one generally "can consent to a search of the dwelling place," including separate bedrooms.), *cert. denied,* 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971); *United States v. Gazzara,* 587 F.Supp. 311, 328 (S.D.N.Y.1984) (homeowner held authorized to permit search of bedroom of former tenant and occasional guest). In this case, Sturman had actual control and access to the entire apartment. Sturman had, for example, allowed her cousin to stay in Charles' bed-

F.2d at 765. Therefore, there was no unreasonable search in violation of the fourth amendment. In addition, since the defendants were lawfully on the premises and had probable cause to arrest plaintiffs, *see, e.g., Ceballos,* 812 F.2d at 50, any arrests were not effected in violation of the fourth amendment. *Payton v. New York,* 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980); *Steagald v. United States,* 451 U.S. 204, 205–06, 211, 101 S.Ct. 1642, 1644, 1647, 68 L.Ed.2d 38 (1981).[8]

Since the Court has found as a matter of law that plaintiffs were not denied of any fourth amendment right, there is no premise for defendants' alleged liability under § 1983. *See Baker,* 443 U.S. at 144 n. 3, 99 S.Ct. at n. 3. Accordingly, defendants' motion is hereby granted and plaintiffs' complaint is dismissed.

SO ORDERED.

---

room at least temporarily. *See* Charles Deposition at 42–43; Newman Deposition at 16.

Alternatively, any entrance in Charles' bedroom was permissible as part of " 'a security check—a very quick and limited pass through the premises....' " *United States v. Jackson,* 778 F.2d 933, 937 (2d Cir.1985) (citations omitted), *cert. denied,* —— U.S. ——, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986). Once lawfully on the premises, the police officers were permitted to conduct a " 'cursory examination' " to check for third persons who might pose a threat to them or destroy evidence. *Id.* (citation omitted). There is no evidence in the record that the defendants conducted anything but a cursory examination of the apartment—if indeed they examined it at all. *See* Newman Deposition at 67.

8. Even assuming that a search of the apartment and an arrest of the plaintiffs violated the fourth amendment, defendants are entitled to good-faith immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

In *Salahuddin v. Coughlin,* 781 F.2d 24 (2d Cir.1986), [the Court of Appeals for the Second Circuit] explained the *Harlow* test as follows: 'The pertinent test in applying [the objective good-faith] defense is whether the federal law violated was clearly established, ... not whether a reasonable person would have known of the law.'

*Weber v. Dell,* 804 F.2d 796, 803 (2d Cir.1986). Plaintiffs have not cited, and the Court has not found, a case clearly establishing that the conduct at issue violated federal law. *Compare, e.g., Dale v. Bartels,* 732 F.2d 278, 285 n. 12 (2d Cir.1984) (*Harlow* immunity held unavailable where alleged unlawful seizures "constitute[d] clear violations of well-known fourth amendment rights of which a law enforcement officer ... had every reason to be aware").