369 S.E.2d 706

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Danny Lee WORLEY, Defendant Below, Appellant.**

**No. 17633.**

Supreme Court of Appeals of West Virginia.

April 11, 1988.

---

Lee H. Adler, Beckley, for Danny Lee Worley.

Jill Miles, Charleston, for State.

MILLER, Justice:

The defendant, Danny Lee Worley, was convicted of first degree murder by a Raleigh County Circuit Court jury in October, 1982. He was sentenced to life imprisonment without mercy. His primary assignments of error are: (1) the admission of evidence seized pursuant to a defective search warrant; (2) the warrantless arrest of the defendant in a private home; (3) the admission of a confession rendered involuntary by improper police promises and deception; and (4) the violation of prompt presentment principles. We find no error and affirm the conviction.

### I.

At 7:30 p.m. on October 8, 1981, the West Virginia State Police received a report of an abandoned vehicle in southern Fayette County. Trooper C.E. Shelton of the Oak Hill detachment responded to the call. As he examined the interior of the vehicle, Trooper Shelton observed blood and debris on the passenger seat and door. His suspicions aroused, he opened the trunk and discovered the badly mutilated body of a woman, Teruco Carter.

Inspection of the body revealed that Ms. Carter had sustained four gunshot wounds to the head and shoulders. Her head and upper body bore areas of "blunt-force" injury which resulted in a depression fracture to the skull. There were approximately twenty puncture wounds to the chest, over half of which had perforated into heart and lung tissue. It was the opinion of the medical examiner that the impact wounds to the head were the immediate cause of death, and that the chest wounds were inflicted post mortem.

After the discovery of the body, Trooper Shelton contacted officers at the Beckley detachment and learned that an associate of the deceased was in custody there on unrelated charges. The associate readily volunteered to cooperate in the investigation. He provided the police with a detailed description of various items of jewelry the deceased wore and of a .25 caliber pistol she carried in her purse. He also stated that the deceased was a frequent patron of "Club 41," a bar in Stanaford.

At 2:30 a.m. the next day, Trooper G.S. Whisman interviewed the bartender who had been on duty at Club 41 on October 7, 1981, the day of the deceased's disappearance. He informed the officer that the deceased arrived at the bar at 10:00 p.m. and was seated with the defendant and another man, Bobby "Ungle." The trio departed in the deceased's car at 11:00 p.m. Mr. "Ungle" returned to the bar around midnight and left in the defendant's car. The defendant did not return to the bar. A written statement was prepared and signed by the bartender within an hour.

After the statement was completed, Trooper Whisman appeared before a Raleigh County magistrate and applied for warrants to search the defendant's car[1] and a trailer in Piney View, where the defendant and Mr. "Ungle" were believed to reside. The property sought by the warrants included blood-stained clothes and the pistol and jewelry described by the deceased's associate. The sole ground for probable cause stated in the search warrant affidavit read: "Statement verifying that Danny Worley and Bobby Ungle were last scene [sic] with the victim[,] were also new [sic] leaving with victim in victims vehicle."

After the warrant had been issued, Trooper J.O. Cole advised his superiors that he was acquainted with Lewis Worley, the defendant's father and the owner of the trailer identified in the warrant. Trooper Cole telephoned the elder Worley and requested that he rendezvous with the officers at an intersection one-half mile from the trailer. The police arrived at 5:00 a.m. Trooper Cole explained to Mr. Worley that the defendant was a suspect in a murder investigation and that the officers wanted to search the trailer. He did not refer to the warrant or produce it for in-

---

1. The return on the warrant for the defendant's car reveals that no property was seized. The validity of this warrant is not challenged on appeal.

spection. Mr. Worley immediately responded: "Jerry, you know you're welcome in my trailer anytime." Trooper Cole then stated that he had a search warrant in his possession, but Mr. Worley assured him that a warrant was unnecessary. He then accompanied the officers to the trailer.

The defendant was asleep in a bedroom when the officers entered the trailer. He was awakened and escorted to a police car, where he was detained while the search progressed. Also present at the trailer was Bobby Hudnell, who had been identified by the bartender as Mr. "Ungle." The police recovered clothes and more than $1,900 in Mr. Hudnell's bedroom. A pistol matching the description in the warrant was seized in the defendant's bedroom. After the recovery of these items, the defendant and Mr. Hudnell were advised of their *Miranda* rights and transported to the Beckley police detachment.

Two further searches were conducted at the trailer in the early hours of October 9. Mr. Worley telephoned Trooper Cole at the station at 7:00 a.m. and advised that he had discovered some of the stolen jewelry in his son's bedroom. When the officer arrived at the trailer, he asked Mr. Worley to sign a written consent to search. After he did so, Mr. Worley led Trooper Cole to the defendant's bedroom and pointed to a pair of boots on the floor. Jewelry was discovered inside one of the boots. At 10:30 a.m., Trooper Cole was again summoned to the trailer. On this visit, Mr. Worley showed the officer a pistol hidden inside a cinderblock. The pistol was identified by ballistics experts as the weapon which had fired the shots into the deceased's head and shoulders. The jewelry and pistol were seized and admitted at trial.

Once at the station, the defendant was taken to the captain's office for interrogation. The defendant's father arrived shortly thereafter and was permitted in the room. Mr. Worley told the defendant that he "need[ed] to cooperate with [the police]." It was also represented that Mr. Hudnell had signed a statement implicating the defendant, though such a statement had not yet been obtained.[2] The defendant responded: "It wasn't [my] idea to kill Teruco Carter." After the oral statement, he expressed a willingness to take the officers to the scene of the murder.

The defendant directed a group of officers to a reclaimed strip mine in a rural area of Raleigh County. Various incriminating statements were made by the defendant while en route to the site. Through the defendant's assistance, the police were able to recover a tire iron, screwdriver, and hammer which he said were used in the murder.

The defendant was promptly returned to the station, where he signed a *Miranda* waiver. At 9:30 a.m., he gave a detailed confession which was tape recorded and transcribed. He admitted robbing the deceased and admitted his presence at the time and place of the murder. He denied any direct involvement in the killing. At 3:30 p.m., after Mr. Hudnell had completed a second statement to the police, both the defendant and Mr. Hudnell were presented to a magistrate.

## II.

■ The defendant initially challenges on Fourth Amendment grounds the validity of the trailer search.[3] By motion dated February 3, 1982, the defendant sought to suppress all fruits of the search due to a

---

**2.** Mr. Hudnell did provide a statement at 10:50 a.m., and another at 2:50 p.m., which implicated the defendant in the murder.

**3.** A matter not raised, but necessary to a resolution of the Fourth Amendment issues, is the defendant's standing to challenge the search. As we recently said in *Marano v. Holland,* 179 W.Va. 156, 163, 366 S.E.2d 117, 124: "At the threshold, ... one who asserts a Fourth Amendment violation must demonstrate a 'reasonable

expectation of privacy' in the subject of the seizure." We are persuaded that the defendant possessed the requisite expectation of privacy in the trailer. Though the record is not well developed, it appears the defendant was, at least, a temporary resident at the trailer which was owned by his father. We held in *State v. Adkins,* 176 W.Va. 613, 616, 346 S.E.2d 762, 766 (1986), that one who "is more than a casual visitor to [a] ... dwelling" may challenge a search and seizure therein.

lack of probable cause for the warrant.[4] A suppression hearing was held in May, 1982, and the motion was denied in a lengthy opinion. On appeal, the State contends that the warrant was supported by probable cause and, in the alternative, that Lewis Worley voluntarily consented to the search.

### A.

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no Warrants shall issue, but upon probable cause,* supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added).[5]

Though it is impossible to define "probable cause" with mathematical precision, "it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527, 546 (1983). Our cases are to like effect. *E.g., State v. Wotring,* 167 W.Va. 104, 279 S.E.2d 182 (1981); *State v. Stone,* 165 W.Va. 266, 268 S.E.2d 50 (1980).

█ The State, in an attempt to sustain the warrant, invites us to consider subsequent oral testimony and a letter written by the magistrate as they bear upon the existence of probable cause.[6] This we are unable to do. When judging the sufficiency of a search warrant affidavit, we are constrained by Rule 41(c), W.Va.R.Crim.P., to look only to the affidavit itself, as it may be supplemented by information contemporaneously recorded. The affidavit may not be supplemented by testimony adduced af-

ter the issuance of the warrant, or by writings which are not physically attached to the affidavit and incorporated therein by reference. We explained our rule in Syllabus Point 2 of *State v. Adkins,* 176 W.Va. 613, 346 S.E.2d 762 (1986):

"Under Rule 41(c) of the West Virginia Rules of Criminal Procedure, it is improper for a circuit court to permit testimony at a suppression hearing concerning information not contained in the search warrant affidavit to bolster the sufficiency of the affidavit unless such information has been contemporaneously recorded at the time the warrant was issued and incorporated by reference into the search warrant affidavit."

█ Judged by the above standards, the affidavit at issue is plainly inadequate. The sole item in support of the affidavit was a hearsay statement, by an unknown declarant, which tended to show that the deceased was last seen in the company of the defendant. While hearsay may provide probable cause for the issuance of a search warrant, we require the existence of information in the affidavit to corroborate the hearsay statement or to vouch for the declarant's veracity. In Syllabus Point 4 of *State v. Adkins,* we adopted the "totality of the circumstances" test developed in *Illinois v. Gates,* and concluded:

"Under the Fourth Amendment to the United States Constitution and Article III, Section 6 of the West Virginia Constitution, the validity of an affidavit for a search warrant is to be judged by the totality of the information contained in it. Under this rule, a conclusory affidavit is not acceptable nor is an affidavit based on hearsay acceptable unless there is a substantial basis for crediting the hear-

---

**4.** Though the defendant attacks only the initial search, he seeks suppression of the confession and property seized in subsequent searches under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *see also State v. Davis,* 176 W.Va. 454, 345 S.E.2d 549 (1986); *State v. Black,* 175 W.Va. 770, 338 S.E.2d 370 (1985); *State v. Winston,* 170 W.Va. 555, 295 S.E.2d 46 (1982).

**5.** Our State counterpart is virtually identical to the Fourth Amendment, and is found in W.Va. Const. art. III, § 6.

**6.** Testimony at the suppression hearing tended to show that Trooper Whisman apprised the magistrate of a coroner's report which fixed the time of death. The letter referenced "papers" attached to the affidavit, presumably the statement provided to the police by the bartender.

say set out in the affidavit which can include the corroborative efforts of police officers."

The factual basis for this affidavit revealed no information that would provide any basis for substantiating the general hearsay statements. It was a "bare bones" affidavit of the type specifically rejected in *Adkins.* [7]

### B.

■ The State asserts that even if the warrant was invalid, the search of the trailer was consented to by Lewis Worley.[8] We have held that a search which is properly consented to is not unreasonable and, therefore, does not violate the Fourth Amendment, as we stated in Syllabus Point 8 of *State v. Plantz,* 155 W.Va. 24, 180 S.E.2d 614 (1971):

"The general rule is that the voluntary consent of a person who owns or controls premises to a search of such premises is sufficient to authorize such search without a search warrant, and that a search of such premises, without a warrant, when consented to, does not violate the constitutional prohibition against unreasonable searches and seizures."

■ A consent to search must be voluntary, and the State must prove the voluntariness of the consent by a preponderance of the evidence. *State v. Hacker,* 158 W.Va. 182, 209 S.E.2d 569 (1974). Whether a consent to search is voluntary is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Craft,* 165 W.Va. 741, 272 S.E.2d 46 (1980). To be voluntary, a consent must not be the "product of duress or coercion," *State v. Craft,* 165 W.Va. at 758, 272 S.E.2d at 56, nor a mere acquiescence to colorable legal authority. *State v. Thomas,* 157 W.Va. 640,

---

**7.** We also reject the State's suggestion that the defective warrant may be salvaged by application of the "good faith" exception in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). As we observed in *Adkins,* 176 W.Va. at 625, 346 S.E.2d at 774–75, the exception is inapplicable where a search warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (Interior quotes omitted) (*quoting Leon,* 468 U.S. at 923, 104 S.Ct. at 3421–22, 82 L.Ed.2d at 699). Furthermore, we indicated in *Adkins:* "Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit...." 176 W.Va. at 625, 346 S.E.2d at 775 (*quoting Leon,* 468 U.S. at 923 n. 24, 104 S.Ct. at 3421 n. 24, 82 L.Ed.2d at 698 n. 24).

**8.** Another issue unaddressed by the parties is whether Mr. Worley possessed the authority to consent to a search of the defendant's bedroom. It is by now well settled that a consent to search need not be obtained from the defendant. *E.g., State v. Williams,* 162 W.Va. 309, 249 S.E.2d 758 (1978); *State v. Plantz,* 155 W.Va. 24, 180 S.E.2d 614 (1971). The State may justify a warrantless search by proof that consent was obtained from another party "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974).

Authority to consent to a search cannot "be implied from the mere property interest a third party has in the property," 415 U.S. at 172 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7, but rather must derive from the party's mutual access to or control over the area to be searched. As we said in Syllabus Point 3 of *State v. Hambrick,* 177 W.Va. 26, 350 S.E.2d 537 (1986): "In deciding if a consent to search is valid, the trial court must make a factual determination whether the consenting party possessed the requisite authority over or relationship to the premises to be searched to justify his allowing the police to conduct a search."

It is significant that Mr. Worley was not only the legal owner of the trailer, but also the defendant's father. A majority of jurisdictions have held that the parent-child relationship is a factor to be considered in the assessment of a parent's authority over areas occupied by a child in the parent's home. *E.g., United States v. Block,* 590 F.2d 535 (4th Cir.1978); *Derrington v. United States,* 488 A.2d 1314 (D.C.Cir.1985); *State v. Jones,* 193 Conn. 70, 475 A.2d 1087 (1984); *Preston v. State,* 444 So.2d 939 (Fla.1984); *Williams v. State,* 166 Ga.App. 798, 305 S.E.2d 489 (1983); *Waddell v. State,* 65 Md.App. 606, 501 A.2d 865 (1985), *appeal denied,* 305 Md. 622, 505 A.2d 1342 (1986); *Wilcher v. State,* 448 So.2d 927 (Miss.1984), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1501, 89 L.Ed.2d 901 (1986); *State v. Carsey,* 295 Or. 32, 664 P.2d 1085 (1983); *see generally* 3 W. LaFave, *Search and Seizure* § 8.4(b) (1987).

There is no evidence on this record that the defendant took any measures to limit Mr. Worley's authority over the trailer and, more particularly, the bedroom. We are, therefore, persuaded that Mr. Worley was authorized to consent to the search.

203 S.E.2d 445 (1974); *State ex rel. Lewis v. Warth*, 131 W.Va. 437, 48 S.E.2d 6 (1948). We summarized our rule in Syllabus Point 8 of *State v. Craft, supra:*

> "Whether a consent to a search is in fact voluntary or is the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."

We are convinced that the State has met its burden under *Craft.* Mr. Worley was highly cooperative with the police, as demonstrated by his statements to Trooper Cole immediately prior to the initial search and his subsequent telephone conversations. The consent was obtained without presentation of the warrant or any other assertion of right by the police. There is utterly no evidence of duress or coercion on the part of the officers. We conclude, under the totality of the circumstances, that Mr. Worley's consent to search was voluntary.

### III.

The defendant next contends that his warrantless arrest in a private dwelling [9] was an unlawful "seizure" of his person in violation of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *Payton* recognized the principle that a police officer is without authority, absent exigent circumstances, to enter into a private home for the purpose of making a warrantless arrest. We summarized this rule in Syllabus Point 2 of *State v. Mullins*, 177 W.Va. 531, 355 S.E.2d 24 (1987): "A warrantless arrest in the home must be justified not only by probable cause, but by exigent circumstances which make an immediate arrest imperative." *See also State v. Davis*, 170 W.Va. 376, 294 S.E.2d 179 (1982); *State v. Craft, supra; State v. McNeal*, 162 W.Va. 550, 251 S.E.2d 484 (1978).

The defendant's position, simply stated, is that his arrest inside the trailer was improper under *Payton* since exigent circumstances were clearly absent. The defendant, however, reads too much into *Payton*'s warrantless arrest rule. The purpose of the rule is to secure the privacy of the home, which lies at the heart of Fourth Amendment protection. To permit an entry into a dwelling, without a warrant, solely for the purpose of an arrest is an impermissible intrusion upon that privacy.

Where, however, a police officer has lawfully entered into a private home through consent or otherwise,[10] a warrantless arrest itself involves no intrusion of privacy in the home.[11] This point was aptly illustrated by *State v. Dyer*, 177 W.Va. 567, 355 S.E.2d 356 (1987), where a police officer was voluntarily admitted into the defendant's home by his wife in the course of a criminal investigation. The defendant accompanied the officer outside, gave an incriminatory statement, and was arrested without a warrant. We upheld the warrantless arrest, and noted that the officer's entry into the home at the wife's invitation was "not ... the type of nonconsensual

---

**9.** We assume, for purposes of this assigned error, that the initial restraint of the defendant inside the trailer constituted an "arrest."

**10.** A police officer may also obtain lawful entry by means of a valid search warrant. *E.g., People v. Gabriel*, 188 Cal.App.3d 1261, 233 Cal. Rptr. 769 (1986); *People v. Green*, 118 A.D.2d 802, 500 N.Y.S.2d 302 (1986). Here the warrant was unsupported by a sufficient probable cause affidavit and was objectively unreasonable on its face and, therefore, would not support the entry.

**11.** This rule was implicitly approved in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). There, police officers entered a private home pursuant to a warrant authorizing a search for narcotics. The owner of the home was detained while the warrant was executed. After narcotics were discovered in the basement, the homeowner was arrested and a search incident to the arrest produced more narcotics on his person. The Supreme Court upheld the warrantless arrest and concluded: "Because it was lawful to require [the homeowner] to re-enter and to remain in the house until evidence establishing probable cause to arrest was found, his arrest and the search incident thereto were constitutionally permissible." 452 U.S. at 705, 101 S.Ct. at 2596, 69 L.Ed.2d at 351. *See also Donovan v. Dewey*, 452 U.S. 594, 598 n. 6, 101 S.Ct. 2534, 2538 n. 6, 69 L.Ed.2d 262, 268 n. 6 (1981) ("*Absent consent* or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant").

intrusion prohibited by the Fourth Amendment." 177 W.Va. at 571, 355 S.E.2d at 360.

■ Many jurisdictions have approved warrantless arrests in a private home where, as in *Dyer*, the officer's entry onto the premises was by voluntary consent. *E.g., United States v. Purham*, 725 F.2d 450 (8th Cir.1984); *United States v. One 1984 Mercedes Benz*, 673 F.Supp. 387 (D.Haw.1987); *Charles v. Odum*, 664 F.Supp. 747 (S.D.N.Y.1987); *Gwynne v. State*, 499 So.2d 802 (Ala.Crim.App.1986); *State v. Alder*, 146 Ariz. 125, 704 P.2d 255 (1985); *People v. Cespedes*, 191 Cal.App.3d 768, 236 Cal.Rptr. 649 (1987); *People v. Rimmer*, 132 Ill.App.3d 107, 87 Ill.Dec. 286, 476 N.E.2d 1278 (1985); *Phillips v. State*, 492 N.E.2d 10 (Ind.1986); *State v. Penny*, 486 So.2d 879 (La.App.1986); *People v. Gary*, 150 Mich.App. 446, 387 N.W.2d 877 (1986); *State v. Blair*, 638 S.W.2d 739 (Mo.1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *People v. Hixon*, 130 A.D.2d 508, 515 N.Y.S.2d 89, *appeal denied*, 70 N.Y.2d 648, 512 N.E.2d 566 (1987); *State v. Rodgers*, 119 Wis.2d 102, 349 N.W.2d 453 (1984). We, therefore, conclude that where a police officer has by voluntary consent entered a private home, he may arrest a person therein upon probable cause without a warrant or the existence of exigent circumstances.

■ Though the search warrant was defective due to the facially insufficient affidavit, the police were lawfully on the premises as a result of a voluntary consent to search given by the defendant's father. Since the entry into the trailer was lawful, the officers were authorized to make a warrantless arrest upon probable cause.

■ Furthermore, the mere insufficiency of the search warrant does not imply that the police were without probable cause to arrest, even before the recovery of the money and pistol.[12] We have held that probable cause to arrest exists "when the facts and circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed...." Syllabus Point 1, in part, *State v. Plantz*, 155 W.Va. 24, 180 S.E.2d 614 (1971). That standard is plainly met here. The bartender had informed the police that the defendant and Mr. Hudnell were seen at the tavern with the deceased, who left in their company in the deceased's car. The deceased was discovered in her car the next day shot, stabbed, and bludgeoned. The bartender further reported that Mr. Hudnell had come back to the parking lot of the tavern to retrieve the defendant's vehicle. The police also had received an autopsy report establishing the approximate time of death in the early morning hours of October 8. This information was sufficient to establish probable cause, and the defendant's arrest was therefore proper.

## IV.

The defendant also assigns as error the admission of his oral and written confessions, which he contends were rendered involuntary by improper police promises and deception. To properly examine the voluntariness issue, it is necessary to set out additional facts relied upon by the defendant.

■ It is first contended that the police impermissibly used promises to foment the hope of favorable treatment. While the police searched the interior of the Worley trailer, the defendant was detained in a car

12. That probable cause to arrest existed prior to the entry onto the premises would not affect the validity of the consent to enter or of the arrest, as illustrated by *United States v. Purham*, 725 F.2d 450 (8th Cir.1984). There, the defendant and another man were observed in the vicinity of a postal robbery. A witness described the defendant to a postal inspector and supplied the defendant's name and address. The description matched that previously provided by the robbery victim. The inspector and local police went to the address and, by visual inspection, verified that the defendant matched the description. The next day, they were admitted into the house by the defendant's mother and sister and the defendant was arrested. The Eighth Circuit determined that probable cause existed prior to the entry, and upheld the warrantless arrest on the basis of the third-party consent. *See also State v. Rodgers*, 119 Wis.2d 102, 349 N.W.2d 543 (1984); *Gwynne v. State*, 499 So.2d 802 (Ala.Crim.App.1986).

by two police officers. These officers purportedly stated that if the defendant would "tell them everything that happened," they would ensure that his bond was set "real low" and that he would be in jail only a "couple of days." The defendant did not respond to the offer. The confession did not occur until after the defendant had been arrested and taken to the State police barracks. We find that the trial judge was correct in concluding that these statements did not induce the defendant's confession for the simple reason that the confession immediately followed the representation that Mr. Hudnell had confessed.

The thrust of the defendant's involuntariness claim is that his confession was the product of deceptive practices by the police. He cites in particular the oral misrepresentation that Mr. Hudnell had confessed.[13] He further suggests that his father was, in truth, an "agent" or "instrumentality" of the police. As support for this claim, he points to the cross-examination of one of the officers which revealed that Mr. Worley had worked in the past as a police informant in drug cases. The record does not reveal the nature of Mr. Worley's assistance or whether any remuneration was received by him for the information provided.

The defendant's attack is predicated chiefly upon *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and *State v. Riser*, 170 W.Va. 473, 294 S.E.2d 461 (1982). These cases, however, involved Fourth Amendment challenges to the seizure of property by private individuals who thereafter surrendered the property to the police. The issue presented in each case was whether the individual was an "agent" of the police, such that the warrant and probable cause requirements of the Fourth Amendment were applicable. We summarized the pertinent law in *Riser*, 170 W.Va. at 479, 294 S.E.2d at 466, as follows:

"If the clothes were seized from the car by a private citizen and handed over to the police officer, no constitutional question would arise. The Constitution does not prohibit searches and seizures by private citizens. *E.g., Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Crabtree*, 545 F.2d 884 (4th Cir.1976); *Sutherland v. Kroger Company*, 144 W.Va. 673, 110 S.E.2d 716 (1959). If, however, a police officer commanded or directed a private citizen to retrieve the appellant's clothes through coercion, domination, or the more subtle techniques of suggestion available to such officials, the Constitution would come into play. *Coolidge, supra*. 'The test ... is whether in light of all the circumstances of the case, [the private citizen] must be regarded as having acted as an "instrument" or agent of the state....' *Id.* 403 U.S. at 487, 91 S.Ct. at 2049, 29 L.Ed.2d at 595."

We do not find that *Coolidge* and *Riser* stand for the proposition, apparently advanced by the defendant, that misrepresentations made by private individuals at the behest of the police automatically render a confession inadmissible.[14] The principal question in all such cases is whether the confession was voluntary. Thus, whether the police operate directly or through the auspices of a third party, the central focus remains the voluntariness of the confes-

---

**13.** The source of the misrepresentation is unclear. At the suppression hearing, the defendant testified that a police officer entered the interrogation room and remarked within the defendant's earshot that Mr. Hudnell had signed a statement. However, in testimony during an in camera examination at trial, the defendant testified that his father had made the statement and the officers merely acquiesced in it. The police denied any misrepresentation.

**14.** The defendant does not argue that the articles found under the consent to search were inadmissible because the consent was coerced,

thereby making the father an agent of the police. The circumstances surrounding the consent to search and its voluntariness were discussed in Part II–B. The fact that the defendant's father may have cooperated with the police in the past on drug cases unrelated to the defendant does not invalidiate the voluntariness of the consent to search. Furthermore, the father's subsequent discovery of additional incriminating evidence, which he then turned over to the police, does not violate *Coolidge* or *Riser*.

sion. *E.g., Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 1265 (1959). We, therefore, must apply our usual voluntariness standard, as expressed in Syllabus Point 5 of *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975): "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case."

■ Whether a misrepresentation as to the status of Mr. Hudnell's confession was made was heatedly contested by the parties. Assuming a misrepresentation was made by the police, or by the defendant's father at their direction, such a tactic would not of itself render the confession involuntary. The general rule is that misrepresentations made to a defendant or other deceptive practices by police officers will not necessarily invalidate a confession unless they are shown to have affected its voluntariness or reliability. *E.g., Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *People v. Martin,* 102 Ill.2d 412, 80 Ill.Dec. 776, 466 N.E.2d 228, *cert. denied,* 469 U.S. 935, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984); *State v. Stubenrauch,* 503 S.W.2d 136 (Mo.App.1973); *People v. Robinson,* 31 A.D.2d 724, 297 N.Y.S.2d 82 (1968); *State v. Jackson,* 308 N.C. 549, 304 S.E.2d 134 (1983); *State v. Woods,* 117 Wis.2d 701, 345 N.W.2d 457 (1984).

■ We do not believe the statement that Mr. Hudnell had confessed to the crime and implicated the defendant would, standing alone, be sufficient to overbear the defendant's free will. This was the technique used in *Frazier,* where the United States Supreme Court declined to hold the subsequent confession involuntary. It stressed that the misrepresentation had occurred only once, after the defendant had been given some of his *Miranda* warnings, and that the interrogation was not prolonged. These same circumstances occurred in the instant case, except that full *Miranda* warnings had been given and the questioning was of shorter duration. We, therefore, conclude that the confessions

were voluntary and find no error in their admission.

## V.

■ The defendant also asserts that he was not presented promptly to a magistrate as required by Rule 5(a), W.Va. R.Crim.P., and W.Va.Code, 62–1–5. Consequently, it is contended that his oral and written confessions should have been suppressed under Syllabus Point 1 of *State v. Guthrie,* 173 W.Va. 290, 315 S.E.2d 397 (1984):

" 'The delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissible] where it appears that the primary purpose of the delay was to obtain a confession from the defendant.' Syllabus Point 6, *State v. Persinger,* W.Va., [169 W.Va. 121] 286 S.E.2d 261 (1982), as amended."

It should be noted that the defendant gave an oral statement shortly after he arrived at the State police barracks. Prior to making this statement, he was advised of and waived his *Miranda* warnings. He then volunteered to take the police to the site of the murder where he pointed out the location of additional inculpatory evidence. During the drive to the crime scene, he made several other oral inculpatory statements. It was the trip to the crime scene which occasioned much of the delay in taking the defendant to the magistrate.

■ In *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986), we emphasized that under our prompt presentment rule, it is the delay which precedes the confession that is critical. This is because the purpose of the prompt presentment rule is to prevent the police from extracting a confession by means of prolonged interrogation. We stated in Syllabus Point 4 of *Humphrey:*

"Ordinarily the delay in taking an accused who is under arrest to a magistrate after a confession has been obtained from him does not vitiate the con-

fession under our prompt presentment rule."

We applied the *Humphrey* Syllabus in *State v. Hutcheson,* 177 W.Va. 391, 394, 352 S.E.2d 143, 146 (1986), and made this point with regard to prompt presentment: "Where there is not found to be such a delay in obtaining the confession, any subsequent delay should ordinarily not vitiate the confession simply because there is no causal connection between this subsequent delay and the procurement of the initial confession." The defendant in *Hutcheson* had provided a written confession and then volunteered to take the officers to a remote area of the county where he claimed stolen equipment could be found. The officers were interested in pursuing this lead, but the equipment could not be found. The trip consumed four hours and, upon the defendant's return, he was taken before a magistrate.

▮ The chief factual distinction in this case is that the defendant's timely oral confession was not reduced to writing until he was returned to the police station some three hours after his arrest. Except for a line of Pennsylvania cases, we are unable to find any helpful authority on the delay issue. The Pennsylvania courts have concluded that a delay in reducing a confession to writing is not fatal if the relevant details were voluntarily disclosed in a prior oral statement which is untainted by delay.[15] *Commonwealth v. Jefferson,* 274 Pa.Super. 140, 418 A.2d 335 (1975); *Commonwealth v. VanCliff,* 483 Pa. 576, 397 A.2d 1173 (1979); *Commonwealth v. Davis,* 460 Pa. 644, 334 A.2d 275 (1975); *Commonwealth v. Rowe,* 459 Pa. 163, 327 A.2d 358 (1974). Here, the defendant's initial statement at the station, coupled with the incul-

patory remarks made while traveling to and from the murder scene, provided all relevant details of the later written confession. We, thus, conclude that the circuit court did not err in the admission of the defendant's oral and written confessions.

### VI.

Two other errors raised by the defendant are without merit. The defendant alleges that a private prosecutor retained by the family of the deceased was guilty of misconduct. Months in advance of trial, the Raleigh County prosecutor offered to accept the defendant's plea of guilty to the charge of first degree murder with a recommendation of mercy. The private prosecutor communicated the plea offer to the family, which advised that they would prefer a trial on the merits. When the Raleigh County prosecutor was notified of the family's wishes, he withdrew the offer. The defendant filed a motion to recuse the private prosecutor, and the motion was denied. On appeal, the defendant objects to the private prosecutor's role in the withdrawal of the plea offer.

▮ It is true, as the defendant suggests, that a private prosecutor is bound by the same standards of professional conduct as a public prosecutor. *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980). We are unable, however, to identify any prosecutorial impropriety. A defendant does not have the right, by statute or by constitutional mandate, to have his case disposed of by a plea bargain, as we indicated in note 5 of *Myers v. Frazier,* 173 W.Va. 658, 664, 319 S.E.2d 782, 788–89 (1984).[16] The private prosecu-

---

**15.** The defendant contends that *State v. Bennett,* 176 W.Va. 1, 339 S.E.2d 213 (1985), should control. *Bennett,* however, dealt with a situation where the police obtained a valid oral confession, but "delayed presentment for the purpose of obtaining a separate confession." We specifically found the delay in presentment "was not merely for the purpose of transcribing a confession." 176 W.Va. at 6, 339 S.E.2d at 218.

**16.** Note 5 of *Myers,* 173 W.Va. at 664, 319 S.E.2d at 788–89, states:

"It is clear that a defendant has no constitutional right to have his case disposed of by way of a plea bargain or to have his guilty plea accepted. *Weatherford v. Bursey,* 429 U.S. 545, 561, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 43 (1977); *North Carolina v. Alford,* 400 U.S. 25, 38 n. 11, 91 S.Ct. 160, 168 n. 11, 27 L.Ed.2d 162, 172 n. 11 (1970). The United States Supreme Court has even suggested that state and federal governments are free to abolish guilty pleas and plea bargaining. *Corbitt v. New Jersey,* 439 U.S. 212, 223, 99 S.Ct. 492, 499, 58

tor did no more than to relay the wish of the deceased's family that the case be vigorously prosecuted. This does not constitute prosecutorial misconduct.

The defendant also challenges the circuit court's denial of his motions to strike two jurors for cause. One of the jurors was the wife of a retired F.B.I. agent who had worked with local law enforcement officers. A second juror was employed by the arson division of the Beckley fire department, a job which involved contacts with city police.

█ Our cases uniformly hold that the primary emphasis in juror qualification cases is whether a potential juror is able to serve "without bias or prejudice ... [and] can render a verdict solely on the evidence under the instructions of the court." Syllabus Point 1, in part, *State v. Wilson,* 157 W.Va. 1036, 207 S.E.2d 174 (1974). *See also* Syllabus Point 3, *State v. Matney,* 176 W.Va. 667, 346 S.E.2d 818 (1986); Syllabus Point 3, *State v. Beck,* 167 W.Va. 830, 286 S.E.2d 234 (1981). We discussed the subject of disqualification due to a relationship between a juror and law enforcement officials in some detail in *State v. Beckett,* 172 W.Va. 817, 310 S.E.2d 883 (1983), and concluded in Syllabus Point 6:

> "A prospective juror's consanguineal, marital or social relationship with an employee of a law enforcement agency does not operate as a per se disqualification for cause in a criminal case unless the law enforcement official is actively involved in the prosecution of the case. After establishing that such a relationship exists, a party has a right to obtain individual voir dire of the challenged juror to determine possible prejudice or bias arising from the relationship."

*See also State v. Brown,* 177 W.Va. 633, 355 S.E.2d 614 (1987).

█ In the present case, the defendant made no request to conduct an individual voir dire as to the juror who was married to a former F.B.I. agent. *Beckett* would

preclude any claim of error since there were no particular facts developed to demonstrate any bias on the part of the juror.

The juror who was a city fireman falls in a slightly different category. The claim of disqualification directed against him is that his occasional work as an arson investigator renders him a law enforcement official. In *Beckett,* we acknowledged the continued validity of Syllabus Point 5 of *State v. West,* 157 W.Va. 209, 200 S.E.2d 859 (1973): "In a criminal case it is reversible error for a trial court to overrule a challenge for cause of a juror who is an employee of a prosecutorial or enforcement agency of the State of West Virginia."

█ We do not find that the fireman's part-time work as an arson investigator makes his position analogous to that of a law enforcement official for purposes of the per se rule in *West.* *E.g., State v. Bailey,* 179 W.Va. 1, 365 S.E.2d 46 (1987) (social worker whose employment involved periodic contacts with prosecutor's office not subject to per se rule). Moreover, the defendant was permitted to voir dire the fireman who represented unequivocally that he would decide the merits of the case based upon the evidence presented. As there was no showing of potential bias, the motion to strike was properly denied.

## VII.

For the reasons discussed above, the judgment of the Circuit Court of Raleigh County is affirmed.

Affirmed.

L.Ed.2d 466, 477 (1978). A summary of alternatives to plea bargaining, which also contains extensive references on the subject, can be found in Alschuler, *Implementing the Crim-* *inal Defendant's Right to Trial: Alternatives to the Plea Bargaining System,* 50 U.Chi.L.Rev. 931 (1983)."