621 So.2d 309 (1992)
Jesse Ellis CLARK
v.
STATE.
2 Div. 693.
Court of Criminal Appeals of Alabama.
February 28, 1992.
Rehearing Denied May 1, 1992.
Certiorari Quashed May 28, 1993.
*311 Thomas M. Goggans, Montgomery, for appellant.
Don Siegelman, Atty. Gen., and Mary Elizabeth Culberson, Asst. Atty. Gen., for the State.
Alabama Supreme Court 1911304.

ON RETURN TO REMAND
McMILLAN, Judge.

I
This cause was remanded to the trial court, 585 So.2d 249, in order for the prosecutor to come forward with race-neutral explanations for his peremptory strikes of black prospective jurors. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court was then to evaluate these reasons in accordance with Ex parte Branch, 526 So.2d 609, modified on rehearing (Ala.1987). The appellant in this case is white. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Ex parte Bird, 594 So.2d 676 (Ala.1991). See also Insley v. State, 591 So.2d 589 (Ala.Cr.App.1991).
In the present case, the trial court conducted an extensive hearing on the matter and has returned the following findings of fact and conclusions to this court:
"FINDINGS OF FACT:
"1. The trial of this case was conducted in November, 1988. On the morning the jury was stricken there were fifty-seven (57) veniremembers present from which to strike.
"2. The State of Alabama was entitled to twenty-three (23) strikes and the Defendant was entitled to twenty-two (22) strikes.
"3. Of the State's strikes, twenty (20) were black and three (3) were white.
"4. Of the Defendant's strikes, four (4) were black and eighteen (18) were white.
"5. The jury consisted of eight (8) white jurors and four (4) black jurors. There were two (2) alternates, both of whom were white.
"6. A transcript of the hearing was taken in which the State of Alabama by its Deputy District Attorney, Edgar W. Greene, explained the reasons for the State's strikes rather than simply repeat in this order the State's espoused reasons for each of its strikes, this Court will simply rely on the transcript for those underlying reasons. In summary, the State of Alabama's strikes were based on information received during voir dire examination and/or by investigation the State conducted regarding potential jurors' previous connection with law enforcement or their family members' connection with law enforcement or crime.
"The reasons given for the State's strikes were:
"1. General opposition to capital punishment;
"2. Connection with law enforcement or criminal activity by the veniremember or family member; or
"3. A combination of reason 1 and 2.
"CONCLUSIONS:
"A. The State of Alabama has given explanations for each peremptory strike *312 it made of potential jurors, whether black or white.
"B. This Court finds that, based on the decisions in Ex parte Branch and Batson v. Kentucky and the line of cases decided by the Alabama Court of Criminal Appeals and the Alabama Supreme Court following those decisions, ... the explanations given by the State of Alabama are sufficiently race-neutral.
"C. This Court finds that the State of Alabama did not use its peremptory challenges in a discriminatory manner and that there has been no violation of the Defendant's rights to equal protection under the 14th Amendment to the United States Constitution or his rights to a jury venire comprised of a fair cross-section of the community under the 6th Amendment to the United States Constitution."
Statistically, approximately 50% of the venire was black, while only approximately 33% of the jury was black. Moreover, the record reveals that the prosecutor used his first 20 strikes against blacks and his remaining three strikes against whites. Because the statistics are indicative of a prejudicial use of peremptory strikes, Ex parte Bird, supra, further examination of the particular reasons given by the prosecutor for his strikes is required. The prosecutor gave the following reasons for his exercise of peremptory challenges against black veniremembers:
1. A black female was struck because she "was generally opposed to capital punishment" and was the sister of a former employee of the police department who was "discharged under allegations of sexual harassment complaints from inmates." The veniremember's brother had also been fired by the county from his employment as a school teacher. Members of the potential juror's family, and possibly the potential juror, were involved in "fraud check allegations concerning an estate of a family member, apparently a mother or aunt which [the prosecutor] personally had to investigate and was called upon to interview" several members of the family.
2. A black female was struck who indicated that "she was generally opposed to capital punishment." Moreover, a family member had been prosecuted, and the veniremember responded that she had had drug and alcohol problems either with herself, a friend, or a family member. She also indicated that she was single and unemployed.
3. A black male was struck who was "opposed to capital punishment." The prosecutor further stated, "There was quite some testimony concerning his position. As I understand it, I even had him down as being struck for cause. But in reviewing the notes here, he was not. He apparently was rehabilitated by the defense." The potential juror also had criminal arrests and convictions.
4. A black female was struck as being "generally opposed to capital punishment."
5. A black male was struck because he "had an arrest record that [the prosecution] felt was excessive based on the people before [them]." The prosecutor indicated that the potential juror had 10 traffic arrests and a misdemeanor conviction. The prosecutor further indicated that the potential juror answered no questions concerning capital punishment at all.
6. A black male was struck who had "19 traffic arrests" and because he was unemployed and near the age of the defendant. However, the prosecutor stated that this potential juror was struck "based on his contacts with law enforcement with his excessive arrests."
7. A black male was struck as being "generally opposed to capital punishment." Moreover, "[t]he victim's family objected to him because he was a competitor of one of the brothers in business. They didn't feel they had a good relationship."
8. A black female was struck as being "generally opposed to capital punishment."
9. A black female was struck as being "generally opposed to capital punishment" and because she responded affirmatively to the question as to whether any potential jurors had been involved *313 with drugs and alcohol either personally, through a friend or through a family member. The prosecutor further stated that she was also struck concerning "reference to crimes and offenses."
10. A black female was struck because she had been arrested and charged with larceny and carrying a concealed weapon. The prosecutor stated that because "[t]his case involved firearms," she was struck.
11. A black male was struck because he had been arrested and charged with homicide in 1978. The prosecutor stated that he had attempted to remove this potential juror from the panel for that reason, but was unable to do so. The prosecutor stated that apparently there was no conviction on the previous homicide charge or "[a]t least we couldn't establish it."
12. A black male was struck because of his record, which contained four or five DUI convictions.
13. A black male was struck because he had 17 traffic arrests and because he lived in an area known as crack city which is "a very high crime area for our community." Moreover, the prosecutor stated that he "had an original very bad impression of him when [the parties] went through the general voir dire and did not feel, just on first impression, that he was somebody [the prosecutor] wanted on the jury." The prosecutor stated, "[i]n looking at his address and knowing his traffic arrests and his contacts with law enforcement and knowing also that he had a kinsman that was prosecuted for robbery, [kinsman's name], as the father of people who live on the same street or near the same street, I think they live on Roosevelt and he lives on the street around the corner, but a family member has been connected with and charged in criminal offenses."
14. A black male was struck as being "generally opposed to capital punishment." Moreover, the prosecutor indicated that there were some recommendations from law enforcement against him serving as a juror "based on his poor reputation." Furthermore, the potential juror indicated that he knew the victim's ex-wife in some manner.
15. A black male was struck because he was a truck driver and the prosecutor indicated that the State "had just finished a case involving a truck driver who had run over an individual here in Selma, which gathered a tremendous amount of publicity." The prosecutor further stated that he had a "very poor reaction to [the potential juror] when we went through voir dire and did not want him on the jury." The prosecutor further stated that he was concerned about a previous prosecution against a member of the potential juror's family for burglary-rape.
16. A black female was struck because she stated that either she or a family member had been charged with or arrested for a serious criminal offense. The prosecutor stated that he knew of someone with the potential juror's last name, "who [the prosecutor] personally prosecuted and felt this was in fact a connection."
17. A black female was struck because her son had been prosecuted.
18. A black female was struck because she indicated that she was "totally undecided" about capital punishment and "[f]or that reason, [the prosecution] removed her from the jury panel." The prosecutor further noted that the potential juror lived in a high crime area which caused him some concern, "[b]ut the main reason for her removal was her lack of position concerning capital punishment."
19. A black male was struck because he had been arrested three times. The prosecutor indicated that the potential juror "was quite well known to [the prosecution]." The prosecutor further stated that his co-counsel had prosecuted the potential juror's son.
20. A black female was struck because she answered that she "was generally opposed to capital punishment."
Thereafter, the prosecutor gave his reasons for striking the three white potential jurors.
*314 While some of the reasons given by the prosecutor were clearly suspect, e.g., living in a high crime area, and subjective, e.g., making a poor impression during voir dire and failure to communicate, see Ex parte Bird, supra, the prosecutor also gave valid reasons for his strikes of the potential jurors for whom he had given the suspect or subjective reasons. See Davis v. State, 555 So.2d 309, 314 (Ala.Cr.App.1989) (wherein the prosecutor gave a highly suspect reason, specifically age, for his strike this court held that, "[w]e do not need to address whether this strike was a sham, however, since the prosecutor stated an additional ground for striking this venireman," which was held to be sufficiently race-neutral). The basis reasons given by the prosecutor for his strikes, as enunciated by the trial court have been held to be sufficiently race-neutral. See, e.g., Gaston v. State, 581 So.2d 548 (Ala.Cr.App.1991) (potential jurors properly struck pursuant to their connections with law enforcement); Fisher v. State, 587 So.2d 1027 (Ala.Cr.App.1991), cert. denied, 587 So.2d 1039 (Ala.1991) (potential juror struck where he indicated bias because the case involved capital punishment and stated that he was unsure whether he could set this bias aside).
The United States Supreme Court has recently addressed the appellate evaluations to be given this issue and emphasized the deference to be paid to the trial court's determination because this matter concerns a "pure issue of fact." Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
"A court addressing this issue must keep in mind the fundamental principle that `official action will not be held unconstitutional solely because it results in a racially disproportionate impact.... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-265, [97 S.Ct. 555, 563, 50 L.Ed.2d 450] (1977); see also Washington v. Davis, 426 U.S. 229, 239, [96 S.Ct. 2040, 2047, 48 L.Ed.2d 597] (1976). `"Discriminatory purpose"... implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker ... selected ... a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.' Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279 [99 S.Ct. 2282, 2296, 60 L.Ed.2d 870] (1979) (footnote and citation omitted); see also McCleskey v. Kemp, 481 U.S. 279, 297-299, [107 S.Ct. 1756, 1769-1771, 95 L.Ed.2d 262] (1987).
"A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral.
". . . .
"... If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination.
". . . .
". . . .
"... In Batson, we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal:
"`In a recent Title VII sex discrimination case, we stated that "a finding of intentional discrimination is a finding of fact" entitled to appropriate deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. 564, 573, [105 S.Ct. 1504, 1511, 84 L.Ed.2d 518] (1985). Since the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. Id., at 575-576, [105 S.Ct. at 1512].' Batson, supra, 476 U.S. at 98, n. 21, [106 S.Ct. at 1724 n. 21].
". . . .

*315 "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will `largely turn on evaluation of credibility' 476 U.S., at 98, n. 21 [106 S.Ct. at 1724, n. 21]. In the typical challenge inquiry, the decisive question will be whether counsel race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lie `peculiarly within a trial judge's province.' Wainwright v. Witt, 469 U.S. 412, 428 [105 S.Ct. 844, 854, 83 L.Ed.2d 841] (1985), citing Patton v. Young, 467 U.S. 1025, 1038 [104 S.Ct. 2885, 2892, 81 L.Ed.2d 847] (1984)."
Hernandez v. New York, ___ U.S. at ___, 111 S.Ct. at 1866-69.
Based on the reasons given by the prosecutor for his strike and on the great deference to be paid to the trial court's findings of fact on this matter, we conclude that the prosecutor's peremptory challenges were not discriminatory.

II
In his brief on return to remand, the appellant has attempted to raise an issue that was not raised on direct appeal. According to Rule 45B, A.R.App.P.: "In those criminal cases in which the death penalty has not been imposed, the Court of Criminal Appeals should not be obligated to consider questions or issues not presented in briefs on appeal." Therefore, the appellant's issue concerning the trial court's instruction to the jury on reasonable doubt is not properly raised before this court.
The remaining issues raised by the appellant in his original appeal will be addressed hereafter.

II
The appellant argues that the trial court erred in failing to excuse for cause three potential jurors: a juror who was a member of the local police force, a juror whose wife had recently been murdered, and a juror who was acquainted with the victim's family.
The record indicates that a member of the venire raised his hand when the prosecutor asked if anyone had ever heard of the appellant before and also when asked if anyone had heard anything previously about the case. The same veniremember responded that he knew the victim's brothers. Thereafter, the veniremember was individually questioned as follows:
"THE COURT: You indicated in the courtroom earlier that you had either heard or read about something concerning this case. Now there's nothing wrong with that. The question first to you is, what is the source of any knowledge you may have? Is it newspapers or talk around town or whatever? What is it?
"[VENIREMEMBER]: Well, the newspapers and talk around town and from some of the family too. I know [the victim's family] pretty well.
"THE COURT: They've discussed this case with you?
"[VENIREMEMBER]: Just in a round-about way.
". . . .
"THE COURT: You indicated earlier that some of the members of the [victim's] family have discussed this case with you or you have learned some information through them. Now what members of the family do you recall receiving this information from?
"[VENIREMEMBER]: I've talked to Clem about it. We've got some land that we hunt on that's close by.
"THE COURT: All right. When was that, do you recall when it was?
"[VENIREMEMBER]: A year or so ago.
"THE COURT: But you were chosen to come up here as a juror?
"[VENIREMEMBER]: Yes. Right.

*316 "THE COURT: Do you remember what, if anything, Mr. Clem Chance told you about this case?
"[VENIREMEMBER]: Other than he was just bitter, you know. Naturally, he would be bitter about it.
"THE COURT: Did he tell you any of the facts of the case?
"[VENIREMEMBER]: No.
"THE COURT: Do you know how long y'all discussed the case?
"[VENIREMEMBER]: A very short time.
"THE COURT: Now, Mr. Clem Chance is a friend of yours?
"[VENIREMEMBER]: Yes, sir.
"THE COURT: Would you consider him to be a friend of yours?
"[VENIREMEMBER]: Yes, well, I know the male Chances. Members of the Chance family. Mr. Lamar Chance which is deceased, we were real close.
"THE COURT: All right. Do you feel that from what you have either heard or read or been told by any member of the family, that your ability to sit and listen to the evidence and render a fair and impartial verdict has been affected by the information that you have received?
"[VENIREMEMBER]: No, sir.
"THE COURT: Do you feel that you could put out of your mind anything anybody has told you or that you have read and render a verdict based solely on the evidence presented to you in the courtroom and put anything else out of your mind?
"[VENIREMEMBER]: I could."
Thereafter, defense counsel further questioned the veniremember as to whether he had seen any of the victim's family in the courtroom that morning. The veniremember responded that he had and that he had spoken to Clem Chance, but only concerning hunting. During the course of this voir dire questioning, the veniremember stated that Clem Chance told him that his brother was killed by the defendant with a shotgun while he was in his own home. He further stated that Clem Chance was a friend of his and that he would believe Clem if he told him something. After stating that Clem Chance had expressed an opinion to him as to whether the appellant was guilty of the crime and should be convicted and sentenced, the veniremember responded that his "opinion about that" was that he had not yet heard the evidence. He stated that he did not yet have an opinion as to whether the appellant was innocent or guilty and that he could put out of his mind what he had been told by Clem Chance.
Qualified jurors need not be totally ignorant of the facts and issues involved in a case. Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'"
Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). "[A] mere expression of opinion which is based on rumor does not render a juror incompetent as long as he does not have a fixed opinion which would bias his verdict. Blevins v. State, 20 Ala.App. 229, 101 So. 478 (1924)." Kinder v. State, 515 So.2d 55, 60 (Ala.Cr.App.1986). Because the veniremember indicated that he could eliminate the influence of Clem Chance's statements and opinions, and render a verdict according to the evidence, the veniremember was competent, and the trial court properly refused the appellant's challenge for cause. Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981). See also Smith v. State, 581 So.2d 536 (Ala.Cr.App.1991) (wherein this court held that a trial court's failure to remove from the jury panel two prospective jurors, who both indicated that they knew members of the victim's family, was not plain error).
Another veniremember originally indicated that he would have trouble serving *317 on the jury in the present case, because his wife had recently been murdered. However, he subsequently indicated that the reason that he did not want to serve on the jury was actually based on the fact that his business could not operate in his absence. The record indicates that during the trial court's qualification of the jury panel, the judge asked if any of the members had a reason for which they felt they should be excused from jury service. The following transpired as to the this veniremember:
"[VENIREMEMBER]: ... I still have a trial pending in court, you know. It's my wife's murder, you know. It still bothers me. I don't feel I can, you know
"THE COURT: You don't feel that you can stay and serve?
"[VENIREMEMBER]: That's right. But if y'all say I have to do that then
"THE COURT: Well, you'll have to be the judge and tell me whether or not personally it would bother you to such an extent that you don't feel you could serve.
"[VENIREMEMBER]: Well, yes.
"THE COURT: I would like for you to stay, ... if you will.
"[VENIREMEMBER]: Well, I'll do the best I can.
"[DEFENSE COUNSEL]: What is the problem?
"THE COURT: [Veniremember's] wife was murdered and he has some personal problems. [Veniremember], stay with us, please, sir.
"[DEFENSE COUNSEL]: Could we ask [veniremember] a few more questions? You said initially that you just didn't feel because of these circumstances that you could be a fair juror?
"THE COURT: I don't think that's what [the veniremember] said. Now don't put words in his mouth.
"[DEFENSE COUNSEL]: That's exactly the words he used when he first stepped up here. You don't feel you could be a fair juror?
"[VENIREMEMBER]: My point is that I feel like it's whatever punishment a man do, he's supposed to be punished the same way at that punishment as he did. That's the way I feel about it.
"[DEFENSE COUNSEL]: We move to exclude him for cause.
"[PROSECUTOR]: Let's wait until we've gotthis is not the time for that.
"THE COURT: [Veniremember], the question is whether or not you could sit and listen to the evidence.
"[VENIREMEMBER]: Oh, I could sit and listen to the evidence. I can sit and listen to the verdict. I can do that.
"THE COURT: Without any prejudice or bias on your part with regard to the facts?
"[VENIREMEMBER]: I can do that. What I'm speaking about is the true evidence of the case.
"THE COURT: Yes, sir. You're talking about later on if in fact the evidence shows
"[VENIREMEMBER]: Yes.
"THE COURT: Now you're not saying that you believe this man is guilty at this point?
"[VENIREMEMBER]: Not now. Not until I hear the evidence. I understand what you mean."
Thereafter, this veniremember was individually questioned as follows:
"[DEFENSE COUNSEL]: ... You remember when you ... came up to Judge Thigpen's bench when the other people were coming up here and they askedhe asked if anybody had any reason why they didn't want to serve on this jury?
"[VENIREMEMBER]: The main reason is my shop is locked up now because I am up here.
"[DEFENSE COUNSEL]: But did you mention something about your wife's murder up there? Do you recall that?
"[VENIREMEMBER]: I did mention that, but now my main thing is my shop is locked up right now. It will probably be locked up here a whole week. That's my main problem.
"[DEFENSE COUNSEL]: Specifically, didn't you say, [veniremember], that your wife was murdered and you hadn't got over that yet and that's why you

*318 "[VENIREMEMBER]: I hadn't gotten over that. I don't think that's somethinglet me tell you about it. None of you will probably have nothing ever like that happen to you. That's something I never will get over. I'll learn to live with it, probably, but I'll not get over it. Now that's as clear as I can get.
"[DEFENSE COUNSEL]: Right. And then you're also saying, [veniremember], earlier when you came up to tell the judge why you didn't feel you could sit on the jury, that that was the reason.
"[VENIREMEMBER]: I didn't feel like they would want me on the jury at that point. I didn't know. I tried to find out. I told him I was willing to stay. Didn't I, judge?
"THE COURT: You did.
"[VENIREMEMBER]: And I would stay. But I didn't want toI wanted to clear that up.
"[DEFENSE COUNSEL]: You understand that if you sit as a juror, you need to be a fair juror?
"[VENIREMEMBER]: I understand this trial here is to be judged according to the witnesses.
"[DEFENSE COUNSEL]: You understand that if you're selected as a juror, you need to be a fair juror?
"[VENIREMEMBER]: That's what I am trying to now, according to the witnesses.
". . . .
"[DEFENSE COUNSEL]: He said he didn't say he couldn't be a fair juror. That's it. You didn't say that?
"[VENIREMEMBER]: I don't know whether I would be a fair juror. That's what I said. I don't know whether I could. I didn't say I couldn't."
Thus, the veniremember clearly indicated that he could listen to the witnesses and the evidence presented and base his determination as to the appellant's guilt or innocence thereon.
"The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. [Tidmore [v. City of Birmingham], 356 So.2d 231 (Ala.Cr.App.1977), cert. denied, 356 So.2d 234 (Ala.1978) ]."
Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981). See also Kinder v. State, supra, at 60. See also Fordham v. State, 513 So.2d 31, 35 (Ala.Cr.App.1986) (wherein a potential juror "stated that even though he did not want to be on the jury, he `could give a fair verdict either way'" and therefore the trial court did not err in denying the defendant's challenge for cause of the potential juror).
During questioning on voir dire, another veniremember indicated that he worked for the Selma Police Department. He also raised his hand when asked if anyone had previously heard the appellant's name, pursuant to which the prosecutor asked if this "knowledge or association" might place the veniremember in such a position that he could not render a fair verdict based on the evidence presented. The veniremember indicated, by his silence, that he could sit as a fair juror. The veniremember was subsequently individually questioned as to the source of his knowledge, and the following transpired:
"THE COURT: The first thing I want to ask you is what is the source of your knowledge with regard to this case? That is, did you read it or did you learn it from somebody else or see it on television?
"[VENIREMEMBER]: The police reports, sir.
"THE COURT: You saw the police records in your duties as a police officer?
"[VENIREMEMBER]: Yes, sir.
"THE COURT: All right. Were you in any way involved in the investigation or did you have anything to do with any aspect of this case at all?
"[VENIREMEMBER]: No, sir.

*319 "THE COURT: Other than that police report, have you read or learned of anything either through the newspaper, television or anything else?
"[VENIREMEMBER]: No, sir.
"THE COURT: Tell us what police report, as you recall, what information you got out of that.
"[VENIREMEMBER]: Well, the information I had was that the next morning was about the shooting that took place over at the trailer behind the Curb Market on Highway 80 East across the river over there, sir.
"THE COURT: All right. Is that the extent of what you remember about it or do you remember any of the other details that were in the report?
"[VENIREMEMBER]: Him going into the trailer. I'm not sure about that though.
"THE COURT: I'm saying, what you're saying now, is that the extent of what you know about this case?
"[VENIREMEMBER]: Yes, that's all.
"THE COURT: Anything you read in that report or anything you have seen in that report, anything affected your ability to sit and listen to the evidence and if you're selected as a juror, to make a decision based solely on the evidence that you hear in the courtroom and not on anything that you read in that police report?
"[VENIREMEMBER]: No, sir.
"THE COURT: In other words, you could do that?
"[VENIREMEMBER]: Yes, sir."
Thereafter, the veniremember was questioned by defense counsel as follows:
"[DEFENSE COUNSEL]: Did you read the entire police report?
"[VENIREMEMBER]: No, sir; just the initial report.
"[DEFENSE COUNSEL]: All right. Now, [veniremember], when you came in to work the next morningI guess homicide is a relative occurrence; is that correct?
"[VENIREMEMBER]: Yes, sir.
"[DEFENSE COUNSEL]: When you came in the next morning, police officers were talking about the case, you know, reading about it and discussing it, about the incident or the past night concerning the investigation or the case?
"[VENIREMEMBER]: Did some of the officers talk about having gone out there to respond to the call? I didn't talk to any officers who went out there, no, sir. They were getting off duty when I came in.
"[DEFENSE COUNSEL]: So [at] no time have you talked to any of the officers having to do with this case, any officer who reported to that scene?
"[VENIREMEMBER]: No.
"[DEFENSE COUNSEL]: All right. You say that you read the police report or reports?
"[VENIREMEMBER]: A report. The initial report was made up.
"[DEFENSE COUNSEL]: One of these incident reports?
"[VENIREMEMBER]: Yes.
". . . .
"[DEFENSE COUNSEL]: Anyone express any opinion to you as to whether or not Jesse Clark was guilty?
"[VENIREMEMBER]: No, sir."
Subsequently, the prosecutor questioned the veniremember as follows:
"[PROSECUTOR]: You don't think you have any particular knowledge about this case at all that would put you in a ... position where you couldn't be a fair juror?
"[VENIREMEMBER]: No, not this particular incident.
"[PROSECUTOR]: All right.
"[VENIREMEMBER]: I read about the incident earlier over at the trailer, but it was
"[PROSECUTOR]: You mentioneddescribe what that incident was.
"[VENIREMEMBER]: A burglary that occurred there some months prior to this.
"[PROSECUTOR]: At Jimmy Chance's trailer?
"[VENIREMEMBER]: Yes.
"[PROSECUTOR]: So you knew Jimmy Chance, the victim?

*320 "[VENIREMEMBER]: Yes.
"[PROSECUTOR]: How long [have] you been a police officer?
"[VENIREMEMBER]: Twenty years and approximately six months.
"[PROSECUTOR]: Do you know who the police officers are who are expected to testify in this case?
"[VENIREMEMBER]: No, sir.
"[PROSECUTOR]: Do you know who the police officers are who [were] involved in responding to the call or the investigation of the case?
"[VENIREMEMBER]: I don't remember the ones.
"[PROSECUTOR]: And since this case has been set for trial, there's been no talk down at the police station about it?
"[VENIREMEMBER]: No, sir.
"[PROSECUTOR]: All right. Did you investigate the burglary out there? Now not this incident, but that prior burglary at Chance's. Did you investigate that one?
"[VENIREMEMBER]: Yes. Officer Dumas and I.
"[PROSECUTOR]: Sir?
"[VENIREMEMBER]: Officer Dumas and I went together.
"[PROSECUTOR]: All right. And is that the first time you had met Jimmy Chance?
"[VENIREMEMBER]: No, I had known him earlier.
"[PROSECUTOR]: How long had you known Jimmy Chance?
"[VENIREMEMBER]: I guess approximately a little over a year.
"[PROSECUTOR]: Now you have never been in business with him?
"[VENIREMEMBER]: No.
"[PROSECUTOR]: Have you ever been a customer of his business?
"[VENIREMEMBER]: Yes, sir; I have gone through there, yes.
"[PROSECUTOR]: Did you socialize at all with Mr. Chance?
"[VENIREMEMBER]: No, sir.
"[PROSECUTOR]: Do you know Jesse Clark?
"[VENIREMEMBER]: No, sir.
"[PROSECUTOR]: Have you ever heard anything about Jesse Clark down at the police station?
"[VENIREMEMBER]: Not down at the police station, no.
"[PROSECUTOR]: Have you heard anything about Jesse Clark any place?
"[VENIREMEMBER]: Other than the time when I made out the report of the burglary.
"[PROSECUTOR]: Sir?
"[VENIREMEMBER]: About the burglary report when I made it out.
"[PROSECUTOR]: I said, when you made out that burglary report that you did the investigation on, Jesse Clark's name came up?
"[VENIREMEMBER]: Yes, sir.
"[PROSECUTOR]: I see. And [was] Jesse Clark in some way implicated in that burglary or was there a suggestion that Jesse Clark had something to do with that burglary?
"[VENIREMEMBER]: Possibly so.
"[PROSECUTOR]: All right. And when you went to that trailer, you knew that Jesse Clark had
"[VENIREMEMBER]: I didn't know anything prior to that, no, sir. After having arrived on the scene, and his name was mentioned
"[PROSECUTOR]: I'm sorry I didn't mean to ask prior to that. When you got to the scene, you knew that Jesse Clark's daughter, Laura, lived in that trailer with Mr. Chance?
"[VENIREMEMBER]: No.
"[PROSECUTOR]: You didn't know that?
"[VENIREMEMBER]: No.
"[PROSECUTOR]: When was that burglary?
"[DEFENSE COUNSEL]: When was the other burglary that you did investigate?
"[VENIREMEMBER]: I don't remember how many months prior to that.
"[DEFENSE COUNSEL]: A number of months at any rate prior to the incident that we're here about today?
"[VENIREMEMBER]: Yes, sir.

*321 "[DEFENSE COUNSEL]: Not as long as a year prior to it, but
"[VENIREMEMBER]: Some months. I'm not sure exactly. I would have to look at the report and refresh my memory.
"[DEFENSE COUNSEL]: Was it within the same year, if you recall?
"[VENIREMEMBER]: Seems like it was within the same year.
"[DEFENSE COUNSEL]: All right. And who told you Jesse Clark might have had something to do with the burglary?
"[VENIREMEMBER]: The lady in the trailer.
"[DEFENSE COUNSEL]: And did you get her name?
"[VENIREMEMBER]: On the report, but I don't recall her name.
"[DEFENSE COUNSEL]: Could it have been Laura Clark or you just don't recall?
"[VENIREMEMBER]: I don't recall."
The Alabama Supreme Court has written the following:
"`The grounds on which a juror may be challenged for cause are set out in Code 1975, § 12-16-150. Additional grounds for challenge for cause under the common law still exist where they are not inconsistent with the statute. Kinder v. State, 515 So.2d 55, 60 (Ala. Crim.App.1986).
"`In challenging a juror for cause, the test to be applied is that of probable prejudice. Alabama Power Co. v. Henderson, 342 So.2d 323, 327 (Ala. 1976). While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. Id; Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1255-56 (Ala.1986); Village Toyota Co. v. Stewart, 433 So.2d 1150, 1156 (Ala.1983). This Court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised. Id. A reversal is not appropriate absent abuse of discretion. Alabama Power Co. v. Henderson, 342 So.2d at 327; Grandquest v. Williams, 273 Ala. 140, 135 So.2d 391 (1961); Mutual Building & Loan Ass'n v. Watson, 226 Ala. 526, 147 So. 817 (1933); Brown v. Woolverton, 219 Ala. 112, 115, 121 So. 404 (1928); see Clark v. State, 443 So.2d 1287 (Ala.Crim.App.1983).
"`Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Crim.App.1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180 (Ala.Crim. App.1986). This determination, again, is to be based on the juror's answers and demeanor and it is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence. See Fordham v. State, 513 So.2d 31, 34-35 (Ala.Crim.App.1986); Jarrell v. State, 355 So.2d 747, 749 (Ala.Crim.App. 1978).'"
Ex parte Ellington, 580 So.2d 1367, 1368-69 (Ala.1990), quoting Knop v. McCain, 561 So.2d 229, 232 (Ala.1989).
Thus, while the statutory grounds for challenges of jurors for cause enumerated in § 12-16-150, Code of Alabama 1975, are not all inclusive, there must be some ground that indicates probable prejudice in order to disqualify a prospective juror. Collins v. State, 385 So.2d 993, 999-1000 (Ala.Cr.App.1979), reversed on other grounds, 385 So.2d 1005 (Ala.1980). Where the ground is nonstatutory, it must be "some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.), affirmed, 435 So.2d 151 (Ala.1983) (wherein members or employees of the Mobile County School Board were not excludable for *322 cause, although the indictment against the defendant charged that the meat was stolen from the Mobile County School Board). In the present case, there is no statutory ground that would exclude a police officer who may have participated in the early investigations of the case. One of the statutory grounds"[t]hat he has an interest in the conviction of acquittal of the defendant"has often been used as a ground for challenge for cause where the prospective juror was a state or city employee or an employee of one of the parties to the action. See, e.g., Shapiro v. City of Birmingham, 30 Ala.App. 563, 10 So.2d 38 (1942); Brackin v. State, 31 Ala.App. 228, 14 So.2d 383 (1943); Parsons v. State, 32 Ala.App. 266, 25 So.2d 44 (1946); McAdory v. State, 37 Ala.App. 349, 68 So.2d 68 (1953). The dialogue between this veniremember and the attorneys indicates that he had no interest in the result of the appellant's prosecution, and the record contains no indication of "absolute bias or favor to support a nonstatutory ground." In Fordham v. State, 513 So.2d 31, 35 (Ala.Cr.App. 1986), this court held that a trial court acted properly in denying defense counsel's challenge of a potential juror "[w]here no other reason, other than the fact that he was a police officer, was given to explain his desire not to be on the jury." See also State v. Worley, 179 W.Va. 403, 369 S.E.2d 706 (W.Va.1988), cert. denied, 488 U.S. 895, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988) (wherein although potential juror's job with the city fire department involved contacts with the city police, he did not have to be stricken for cause, because defendant was permitted to voir dire juror, who indicated unequivocally that he could decide the merits of the case based upon the evidence presented); State v. Ellis, 208 Neb. 379, 303 N.W.2d 741 (Neb.1981) (wherein a prospective juror, who was a police officer acquainted with many of the testifying officers and who was of the opinion that the victim had been murdered, did not have to be struck for cause). But see Shapiro v. City of Birmingham, supra (wherein this court determined that a city policeman was subject to challenge for cause where the city was the plaintiff in the prosecution for the violation of its ordinance); Brackin v. State, supra (wherein this court held that a city police officer is not "ipso facto" disqualified to serve on the jury where the prosecution is brought by the state).
Although the veniremember may have aided in the initial stages of an earlier burglary investigation involving the appellant, we find no indication that he was further involved in the case. In Peoples v. State, 510 So.2d 554, 564-65 (Ala.Cr.App. 1986), affirmed, 510 So.2d 574 (Ala.1987), cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987), this court addressed a situation in which a potential juror was not struck for cause although he was a reserve deputy sheriff and had ridden with the sheriff to the location where the victims' bodies were found. This court concluded that the "[a]ppellant's assertions that [the veniremember] helped transport the bodies and aided in the investigation are not supported by the record." In Lynn v. State, 543 So.2d 704, 706 (Ala.Cr.App.1987), affirmed, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989), the defendant charged that his challenge for cause of a veniremember who had been the mayor and who, in that capacity, had exercised "supervisory authority" over testifying officers from the city police department was properly denied. This court held that, "[i]n the absence of any showing that [the veniremember] actually exercised his `supervisory authority' over the officers at any time during the investigation or that he participated in the investigation, we find that the challenge for cause was properly denied." Id. at 706. In the present case, the prosecutor stated that the initial burglary investigation had nothing to do with the instant offense and would not be brought up at trial. The record indicates that evidence concerning this prior offense was not admitted at trial. Moreover, this court has held that "[p]rospective jurors who have heard of a defendant's previous conviction on the same charges need not be automatically excluded from the venire. [Citations omitted.] A prospective juror with knowledge of a previous conviction need not be dismissed for *323 cause if the trial court determines that the jury does not have a fixed opinion of appellant's guilt, but rather can lay aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court." Beck v. State, 485 So.2d 1203, 1205 (Ala.Cr.App.1984), affirmed, 485 So.2d 1207 (Ala.1985). (Emphasis in original.) Thus, any knowledge by the veniremember, in the present case, that the appellant might have been involved in a prior burglary need not result in his automatic exclusion from the venire, because he indicated that he did not have a fixed opinion as to the appellant's guilt and that he could render a verdict based solely on the evidence presented.
Because of the veniremember's assurances that he could function as a fair juror and could make his determination concerning the appellant's guilt on the basis of the evidence presented, we find no abuse of discretion by the trial court in denying the appellant's challenge for cause. Cf. Ex parte Ellington, supra (wherein a veniremember indicated that her husband was on the police force and that she knew at least one detective who was to testify and she also indicated that this knowledge would affect her ability to hear the case).

IV
The appellant argues that the trial court erred in instructing the jury on self-defense that it had to "find that [appellant] acted in self-defense" and in refusing to charge the jury as to self-defense on the burglary aspects of the capital offense. The appellant submitted a written request for the following jury charge as to burglary: "When there is evidence of self-defense, the prosecution must then prove beyond a reasonable doubt that the defendant did not act in self-defense." The trial court refused this requested charge, and defense counsel excepted to the refusal. Thereafter, the trial court charged the jury as to self-defense as follows:
"The defendant must intentionally, as opposed to negligently, accidentally or recklessly or having acted in self-defense, cause the death of the deceased in order to invoke the capital statute....
"It must not have been done in self-defense. To be a capital offense, the murder of an intentional killing type must have been committed during burglary in the first degree.... Therefore, if you are convinced by the evidence beyond a reasonable doubt that the defendant committed the crime of murder of the intentional killing type of Jimmy Chance by the means alleged in the indictment, that he did not act in self-defense during a burglary in the first degree or an attempt thereof as previously defined for you then it would be your duty to find the defendant guilty of the capital offense charged in the indictment. On the other hand, if you are not convinced beyond a reasonable doubt that the defendant committed the crime of murder of the intentional killing type by the means alleged in the indictment or if you are not convinced by the evidence beyond a reasonable doubt that the murder of an intentional killing type was committed during a burglary in the first degree or an attempt thereof, was committed by the defendant or if you find the defendant acted in self-defense, then the defendant cannot be convicted of the capital offense as charged in the indictment."
Thereafter, the trial court charged the jury as to the lesser-included offense of murder and, in doing so, further defined self-defense as follows:
"You must find that in doing the acts which caused the death of the deceased, the defendant was not justified in using whatever physical force upon that person as he reasonably believed was necessary in order to defend himself from what he reasonably believed at the time to be the use of unlawful physical force by that other person.
"Now a person may use deadly physical force in defending himself or a third person under the circumstances if he also reasonably believes such other person is using or about to use unlawful deadly force. A person is not, however, justified in using deadly physical force upon *324 another person if it reasonably appears or if he knows that he [can avoid] the necessity of using such force with complete safety by retreating.
"A person, however, is not justified in using physical force upon another person even under these circumstances if, one, he provoked the other person to the use of unlawful physical force with intent to thereby cause physical injury or death to that person; or, two, he was the initial aggressor except that his use of physical force upon another person under these circumstances is justifiable. If he withdraws from the encounter, effectively communicates to the other person his intent to do so, but the other person nevertheless continues or threatens the use of unlawful physical force, or the physical force involved was the product of a combat by agreement which is not specifically authorized by law."
The latter part of the above-quoted jury instructions were taken from some of the defendant's submitted requested charges as to self-defense. Following the trial court's oral instructions to the jury, the appellant objected to the trial court's language "if you find the defendant acted in self-defense" and, instead, requested that he restate it as "if you do not find that he did not act in self-defense." The trial court responded, "I specifically instructed that each element of each offense, they must find that he was not justified."
The trial court's oral instructions substantially and fairly covered the requested written charge submitted by the appellant. Rule 15, A.R.Crim.P.Temp. Thus, there is no basis for the appellant's argument that the trial court erred by failing to give his requested charge. Shaneyfelt v. State, 494 So.2d 804 (Ala.Cr.App. 1986). Moreover, we find no error in the trial court's language. The trial court is vested with broad discretion in formulating its charge, so long as it accurately reflects the law. United States v. Andrews, 765 F.2d 1491 (11th Cir.1985), cert. denied, Royster v. United States, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986).

V
The appellant argues that the trial court erred in instructing the jury that the trial court had already determined the voluntariness of the appellant's statement. The record indicates that during its oral charge to the jury the trial court instructed as follows:
"Now with regard to the alleged statement that was made by the defendant at certain times to certain police officers, you can consider all the facts and circumstances surrounding the taking of that alleged statement and determining the weight and credibility, if any, which you give to that alleged statement. In exercising your exclusive prerogative of determining the credibility of the evidence or the weight to which the evidence is properly entitled, you can consider the circumstances under which the alleged statement was obtained. The principal by which it was supposedly elicited, including the situation and the mutual relations of the parties.
"Now while I determine the voluntariness of a statement such as this, it is your duty to determine its weight and its credibility and you may disregard any alleged statement which you consider to be unworthy of belief or in which you entertain a reasonable doubt as to its truth."
The Alabama Supreme Court has analyzed the bifurcated determinations to be made concerning the voluntariness of a confession by the trial court, as finder of law, and the jury, as finder of fact, as follows:
"It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible. Clifton v. United States, 371 F.2d 354 (D.C.Cir.1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967); United States v. Inman, 352 F.2d 954 (4th Cir.1965). In the case at hand, however, the trial judge made it clear to the jury that they were to ultimately determine whether the confession was voluntary. We agree, therefore, with the *325 Court of Criminal Appeals that there was no prejudicial error, since the comments of the trial judge `did not imply that the jury should accept and believe appellant's confession based on the trial court's ruling that the statement was voluntary.'
". . . .
"Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial court makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession. Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976)."
Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985) (emphasis original).
In the present case, as in Ex parte Singleton, the trial court's charge when read as a whole did not indicate that the jury should believe the appellant's confession because the trial court had determined it to be voluntary; nor did it indicate that the jury had no role in determining its voluntariness. Rather, the trial court's instructions informed the jury of its role in determining what weight should be given the confession.

VI
The appellant argues that the trial court erred by allowing the prosecutor to introduce evidence of acts of physical and sexual abuse by the appellant, not charged in the indictment, in violation of the general exclusionary rule and of the appellant's rights to a fair trial, due process, and the presumption of innocence. The record indicates that the victim, who was 47 years old at the time of his death, had previously lived close to the appellant and his family in Tennessee. The victim had lent the appellant money from time to time and had begun seeing the appellant's daughter. The victim subsequently moved to Selma, Alabama, but continued to help the appellant financially. The victim suffered a stroke, which greatly disabled him. The appellant's daughter moved in with the victim and lived in his trailer. The appellant's daughter and his ex-wife testified that, several months prior to the offense, the ex-wife telephoned the daughter and told her that the appellant had been physically abusing her and that she feared for her life and for the lives of her two young sons. The appellant's daughter drove to pick up her mother and her brothers and returned with them to the victim's trailer. The appellant began calling them and asked them to return to his house. When his ex-wife refused to return, he threatened to kill his daughter and the victim, and his ex-wife returned to him. Thereafter, the appellant's ex-wife again called her daughter and asked her to come and rescue her and the two boys. She testified that she feared for her life and that the appellant had again threatened to kill her. The victim advised the daughter not to go, because he feared for her life. However, the daughter drove to Tennessee and picked up her mother and two brothers. They returned to the trailer, where the mother and two boys lived for several weeks prior to the offense. The appellant continually called the trailer and begged his wife and the two boys to return. When they refused, he threatened the lives of the daughter and the victim. The daughter began to fear that her mother would return to the appellant; therefore, she told the mother that the appellant had been sexually abusing her for many years. The daughter stated that she had not told her mother this in the past, because, she said, the appellant had told her that, if she did tell, he would kill both her and the mother. The mother confronted the appellant with this accusation by telephone and the appellant denied it.
The ex-wife testified that on the night of the offense, she was awakened by the sound of the victim's pickup truck, which she recognized. The appellant was outside the trailer, with a shotgun, and was wearing yellow gloves. As he approached the trailer, the mother yelled for the daughter to run away, because she believed that the appellant would kill her. The appellant knocked at the door and demanded to be allowed inside. The daughter grabbed the youngest boy and ran with him to the back *326 of the trailer, leaving him on the bed, and escaped through a window. The mother picked up a pistol, which belonged to the victim, and, when the appellant knocked the glass out of the door and began reaching for the knob, she fired three shots toward the door. The appellant gained entry to the trailer and, once inside, began looking for the daughter. The mother pleaded for the daughter's life; however, the appellant continued to look for her. He saw the open window and then began to exit the trailer, as a police car arrived. The body of the victim was found, face down, outside the trailer, where he had been shot.
The appellant argues that the testimony concerning his prior abuse of his ex-wife and daughter was inadmissible, being collateral offenses that were admitted to show bad character. However, the prior offenses were properly admitted, pursuant to the motive exception to the exclusionary rule.
"While the general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character or an inclination or propensity to commit the type of crime for which the accused stands charged, where the commission of another crime or misdeed is an element of guilt or otherwise tends to prove his guilt, then proof of such other crime or misdeed is admissible. Nelson v. State, [511 So.2d 225 (Ala.Cr.App.1986), affirmed, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988) ]; C. Gamble, [McElroy's Alabama Evidence] § 69.01(1) [3d ed. 1977].
"One well-recognized exception to the general exclusionary rule is relevancy to prove motive. The motive element for homicide may take many forms; it may include the purpose of the homicide. C. Gamble, supra, at § 70.01(12)(e). Whenever evidence of a crime is relevant to prove the motive for the now-charged homicide, it is admissible. Id. The state may prove the accused's commission of a previous crime if the evidence warrants a reasonable inference that he committed the now-charged homicide for the purpose of escaping arrest and conviction for the previous crime. Nelson v. State; C. Gamble, supra, at § 70.01(12)(e)."
Newsome v. State, 570 So.2d 703, at 716 (Ala.Cr.App.1989). See also Giddens v. State, 565 So.2d 1277, 1280-81 (Ala.Cr.App. 1990) (evidence that checks had been returned for insufficient funds was held admissible pursuant to the motive exception to the exclusionary rule in a case charging the misappropriation of an employer's funds).
In the present case, these prior bad acts by the appellant were admissible to show the appellant's motive in committing the now-charged offense. Therefore, as the evidence concerning these offenses was not admitted solely for the purpose of showing the appellant's bad character, and the evidence was relevant to the now-charged offense, we find no error by the trial court in allowing such testimony.

VII
The appellant argues that the trial court erred in denying, by operation of law, his motion for a new trial without a hearing, because, he says, he produced allegations of newly discovered evidence which, if believed, would have entitled him to a new trial. Specifically, the appellant alleged that, while at the Kilby Correctional Facility in Montgomery, Alabama, he saw someone who looked like the man who had given him a ride to the victim's trailer on the night in question. He alleged that he later discovered that the individual was, in fact, the man and that he would testify that, on the night of the offense, he had parked nearby and had observed that the victim fired at the appellant first and that the appellant only fired one shot. This would corroborate the appellant's testimony. Moreover, the appellant alleged that the man's identity and whereabouts were not known by him previously; that he had searched for the individual; and that the individual's whereabouts could not have been discovered through the exercise of due diligence, because that night he had driven to Mississippi because he was a fugitive. Thus, the witness, if he had testified, *327 would have acknowledged that the appellant had shot and killed the victim, which is uncontradicted, but would have supported the appellant's claim that he acted in self-defense. The record indicates that the appellant's motion for new trial was denied by operation of law, because the trial court failed to rule on the motion within the prescribed 60-day time limit. Rule 13(d), A.R.Crim.P.Temp.
In the present case, the state presented sufficient evidence to support the appellant's conviction, and there was no error in the denial of the motion for new trial. Williams v. State, 568 So.2d 354 (Ala.Cr.App.1990). This court has held that, where a defendant alleged newly discovered evidence in the form of a witness who would support the appellant's alibi and testify that the appellant did not have the same hair style described by the state's witnesses, a new trial was not warranted. This court held that such testimony was merely impeaching or cumulative. "`Evidence tending merely to impeach or contradict a State witness as to the testimony given upon the trial is generally not such newly discovered evidence as would warrant the granting of a new trial.' Dossey v. State, 489 So.2d 662, 666 (Ala.Cr.App. 1986)." Midell v. State, 570 So.2d 820, at 822 (Ala.Cr.App.1990). (Footnote omitted.)
Moreover, the fact that the appellant's motion for new trial was denied without a hearing does not constitute error. See Foster v. State, 548 So.2d 475, 477 (Ala.Cr.App.1987) (motion for new trial was properly denied without a hearing, because trial court stated that all matters complained of by the appellant were before the jury at trial). "A defendant is not entitled to a hearing on a motion for new trial without a special basis therefor." Smelcher v. State, 520 So.2d 229, 232 (Ala.Cr.App. 1987). In the present case, the appellant did nothing to attempt to secure a ruling by the trial court within the prescribed time, thereby allowing the motion to be denied by operation of law. Thus, the appellant should not now complain that his motion was denied by operation of law. See, e.g., Griggers v. State, 560 So.2d 1098 (Ala.Cr.App.1989); Leonard v. State, 551 So.2d 1143 (Ala.Cr.App.1989).

VIII
The appellant argues that the indictment failed to charge the capital offense of murder committed during the commission of the burglary in the first degree. The record indicates that the indictment charged the appellant as follows:
"The Grand Jury of said County charge that before the filing of this indictment, Jesse Clark, whose name is otherwise unknown to the Grand Jury other than as stated, did intentionally cause the death of Jimmy Chance by shooting him with a shotgun and Jesse Clark caused said death during the time that Jesse Clark knowingly and unlawfully entered or remained, or attempted to enter or remain, unlawfully in the dwelling house of Jimmy Chance with intent to commit the crime of Assault, therein, and while effecting entry or while in the dwelling or in immediate flight therefrom, said Jesse Clark was armed with a deadly weapon or dangerous instrument, to-wit: a shotgun, in violation of Section 2(a)(4) of Act no. 81-170 Against the peace and dignity of the State of Alabama."
The appellant argues that the instant indictment was faulty as to the burglary element because the indictment did not define the means or object of any assault. Further, he argues that the indictment was faulty because it failed to set forth any elements of assault.
The crime of burglary in the first degree is defined by § 13A-7-5 as follows:
"A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with the intent to commit a crime therein and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:
"(1) Is armed with explosives or a deadly weapon; or
"(2) Causes physical injury to any person who is not a participant in the crime; or

*328 "(3) Uses or threatens the immediate use of a dangerous instrument."
In the present case the indictment properly charges that the appellant did knowingly and unlawfully enter the victim's dwelling with the intent to commit a crime therein, assault, while armed with a deadly weapon, a shotgun. While it is clear that an indictment for burglary must set forth the specific crime intended to be committed within the dwelling, Popwell v. State, 480 So.2d 41, 45 (Ala.Cr.App.1985), a statement of that offense is sufficient to notify the appellant of the nature of the charges against him. Holmes v. State, 505 So.2d 1308, 1312 (Ala.Cr.App.1987) (the "indictment... properly set forth that theft was the felony intended to be committed"). "`The intent is the gravamen of the offense charged, although the intended act need not be carried to completion.' Coleman v. State, 443 So.2d 1355, 1358 (Ala.Cr. App.1983)." Garrison v. State, 521 So.2d 997, 1003 (Ala.Cr.App.1986). "The indictment or information shall be a plain, concise statement of facts in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment." Rule 15.2(a), A.R.Crim.P.Temp. The present indictment follows the statutory form for the crimes charged, and the appellant was sufficiently apprised of the particulars of the offenses to enable him to prepare a defense. Garrison v. State, supra.

IX
The appellant argues that the state presented insufficient evidence to sustain his conviction. However, the appellant himself presented sufficient evidence through the testimony of his daughter and his wife, see part VI, for the case to be submitted to the jury. Furthermore, the state presented evidence that, as he was being led away by the police following the shooting, the appellant stated, "He had it coming to him." Thus, the case was properly submitted to the jury for its determination as to the weight and probative value of the evidence. Woods v. State, 344 So.2d 1225 (Ala.Cr.App.1976), cert. quashed, 344 So.2d 1230 (Ala.1977). We find no abuse in the trial court's decision.
OPINION EXTENDED; AFFIRMED.
MONTIEL, J., concurs.
PATTERSON, P.J., concurs except for Part V, and in Part V, concurs in result only without opinion.
BOWEN, J., concurs specially with opinion.
TAYLOR, J., dissents with opinion.
BOWEN, Judge, concurring specially.
I concur in the result reached by the majority in Part V of that opinion. Quite obviously, the trial court did improperly instruct the jury to the effect that he had determined that the confession was voluntary. However, he also instructed the jury, in substance, that they could give the statement whatever credence, if any, they felt it deserved. Technically, error was committed. However, I do not consider that error cause for a reversal of the appellant's conviction.
TAYLOR, Judge, dissenting.
I must take issue with part II of the majority opinion as regards the three prospective jurors which were not struck for cause. One prospective juror told the court that he knew the victim's family and had discussed the case with them. "We note that a close relationship between a veniremember and a victim may give rise to an impression of possible bias." Marshall v. State, 598 So.2d 14 (Ala.Cr.App.1991). Another juror was a police officer who had knowledge of the case from police reports, again a source other than the witness stand. The other member of the venire had lost a wife by murder within weeks of this trial. I have great concern regarding this juror's emotional ability to serve on the jury. In fact, this prospective juror told the trial court that he did not wish to serve. This pattern of refusing to excuse jurors whose circumstances make their impartiality *329 highly suspect will eventually result in a reversal of this capital murder case.
The Alabama Supreme Court has held that it does not matter whether the prospective jurors in fact served on the jury. See Knop v. McCain, 561 So.2d 229 (Ala. 1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988). "In Alabama, a defendant has the right to strike a petit jury from a panel of fair-minded, impartial prospective jurors." Hunter v. State, 585 So.2d 220, fn. 1. (Ala.Cr.App.1991).
The appellant did not receive a fair trial.